[Crim. No. 21853. May 26, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT WARREN et al., Defendants and Appellants.

COUNSEL

Howard W. Gillingham and Frank O. Bell, Jr., State Public Defender, under appointments by the Supreme Court, Monica Knox, Chief Assistant State Public Defender, and J. Courtney Shevelson, Deputy State Public Defender, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Susanne C. Wylie, Carol Wendelin Pollack, Gary R. Hahn and Thomas L. Willhite, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—At the guilt phase of a capital trial under the 1978 death penalty law (Pen. Code, § 190.1 et seq.), defendants Robert Warren and Woodrow Warren were each convicted by a jury of the first degree murder of Homero Flores and Antonio Herrera (*id.*, § 187) and the robbery of Flores, Herrera, and Angel Rebeles (*id.*, § 211). As to each murder the jury found the following special circumstances for each defendant: felony murder-robbery (*id.*, § 190.2, subd. (a)(17)(i)), and multiple murder (*id.*, subd. (a)(3)). At the penalty phase the jury returned against each defendant a verdict of death. Judgment was entered accordingly. This appeal is automatic. (*Id.*, § 1239, subd. (b).)

As we shall explain, we conclude that as to each defendant the judgment of guilt must be affirmed and all but one special circumstance finding must be upheld. We further conclude that as to each defendant the judgment of death must be reversed because the trial court delivered an unqualified "Briggs Instruction" in violation of *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430].

The evidence introduced at trial told the following tale. In the early morning hours of September 8, 1979, Herrera, Flores, and Rebeles were gathered outside Rebeles's home, drinking beer and listening to the radio in an automobile. Flores was seated in the car; the others were standing nearby. Rebeles saw three Black men walk past on the other side of the street, then return. Two of the men crossed the street toward Herrera, Flores, and Rebeles. One of the two, whom Rebeles identified in court as defendant Robert Warren, pointed a gun at Herrera and Rebeles and ordered them to lie down on the grass between the sidewalk and the street. The other man— who was never identified—pulled Flores from the car, pushed him down on

the grass, and took his wallet. The third man, whom Rebeles identified at trial as defendant Woodrow Warren, then crossed the street toward the others. He tried unsuccessfully to start the car. He asked Flores for the keys; Flores said they were in the house.

While Robert was holding the gun, the unidentified robber took jackets from Herrera and Rebeles and 50 cents and house keys from Rebeles. The unidentified robber began to search Herrera. Herrera apparently rose to his haunches and began to twist from side to side to protect his pockets. Robert then asked, "Can I shoot?" Woodrow replied, "Yes," and Robert shot Herrera in the head. Flores began to rise and Robert shot him in the side. The robbers then fled. Flores and Herrera died from their wounds. Woodrow's palm print and several unidentified prints were subsequently lifted from the driver's door of Flores's car.

Rebeles testified that he had seen the three robbers in the neighborhood twice within three days of the shooting. Woodrow is evidently an imposing individual—tall, muscular, and bald, with a tattoo of a revolver on his left bicep. Robert is apparently of average height and had braided black hair and a little beard.

There was considerable confusion and conflict in the testimony at trial. Three young men who were near the scene testified they heard shots and saw three Black males running away. Mark Sutton, Belinda Campbell, Steven Hicks, and Steven's sister Theresa Myles were gathered outside the house next to Rebeles's when the crime occurred. Sutton testified he saw two Black men walk by and approach the group next door; the shorter man carried a shiny object and told Campbell and Myles to drive away; Sutton and Steven Hicks went inside the house; as he was entering he heard a shot. Steven Hicks, who had been reluctant to testify, related a similar story on the stand. He was impeached, however, with prior statements he had made to the police: he had told them that he saw three men walk by, that one was bald and one was shorter than the others and was carrying a gun, and that the three ran away after the shots were fired. Myles testified she did not see anything, but heard a shot and drove off. She was impeached with prior statements she had made to the police: she had said she saw three men walk up the street and back; two of them crossed the street, the shorter carrying a gun; the third, who remained on the other side of the street, was large and muscular and also had a gun; she drove up the street, heard a shot, and saw the three men run past.

Rudolph (Rudy) Hicks, who was the 12-year-old brother of Steven Hicks and Myles, also testified, as did his friend, Jeffrey Pyles. Each claimed he had been in bed when the crime occurred, but had been told all about it by

the other the next day. Both boys had discussed the crime with the police soon after it occurred. Rudy's version of the events paralleled that given by Rebeles in his testimony at trial and that given by Steven Hicks and Myles in their statements to the police. He testified he had seen the robbers many times at a liquor store in the neighborhood, and described one of the robbers as tall, well-muscled, weighing about 200 pounds, and having a gun tattooed on his left upper arm. But he also said he had gone inside when he saw the two robbers cross the street and had only heard, not seen, the shooting. To the police and to Pyles, however, he had stated that it was the taller, bald robber who had the gun and that that robber did the shooting from across the street. Pyles gave the police a description of the events similar to Rudy's, and testified at trial that everything he had told the police was either made up or was based on what Rudy had told him. The police officer who interviewed Pyles after the crime testified he had concluded Pyles had not been outside during the shootings.

Each defendant attempted to show that he was not involved in the crimes charged. Very soon after the event Rebeles had identified a mug shot of a man named Lamont Bell as the tall, muscular robber. Inconsistencies existed in the testimony of the witnesses concerning how many gunshots were fired and whether the robbers ran or drove away from the scene. Lulu Washington, who has a child by Woodrow, testified that on the night of the crime both defendants were at her home. She knew they were present all night because she was watching movies on television until dawn, with Woodrow asleep beside her in bed and Robert visible through the open bedroom door, asleep on the couch.

In rebuttal Rebeles testified that Bell was not one of the robbers, but Woodrow was. Bell testified he was nowhere near the scene of the crime on the night in question.

## I. GUILT ISSUES

Defendants raise numerous challenges going to the issue of guilt. None, however, has merit.

### A. *Representative Jury*

■ Both defendants contend they were denied their constitutional right to an impartial jury drawn from a fair cross-section of the community (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16) because the venire was compiled exclusively from voter registration lists, which purportedly contained a percentage of Blacks and Hispanics disproportionately lower than the percentage of these groups in the community.

In *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], we held that " 'In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' " (*Id.* at p. 50, quoting *Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587, 99 S.Ct. 664].)

Defendants have satisfied the first prong of the *Harris* test: Blacks and Hispanics each constitute a cognizable group. (*People* v. *Harris, supra,* 36 Cal.3d at p. 51.)

Defendants fail, however, to satisfy the second prong. The data they offer to demonstrate disparity antedates the redrawing of jury districts ordered to remedy any significant disparity, and therefore must be rejected as outdated in the absence of a showing of continuing validity. Accordingly, defendants do not make out a prima facie case of a violation of the fair-cross-section requirement.

### B. *"Death-qualified" Juries*

Defendant Woodrow urges us to reexamine our holding in *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680] (plur. opn.), 374 (Kaus, J., conc.), that the exclusion for cause at the guilt phase of jurors who could never vote for the death penalty does not violate a defendant's fair-cross-section rights. As we explained in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 748 [230 Cal.Rptr. 667, 726 P.2d 113], we find no reason to do so.

### C. *Access to the Law Library*

Defendant Woodrow contends that the court erroneously denied him access to the jail law library. During a pretrial hearing he briefly asked the court to order the sheriffs to allow him use of the library. The court responded: "Well, I'm going to follow the established policies, and that is when the defendants are represented by counsel, they receive no special privileges of that kind. [¶] That request is denied at this time . . . . [¶] Both defendants are represented by counsel that are more than adequate to research and to apply the law, and I think amateur efforts by the defendants would not be helpful."

In *People* v. *Rhinehart* (1973) 9 Cal.3d 139, 150 [107 Cal.Rptr. 34, 507 P.2d 642], we emphasized that an inmate does not have an absolute right to

use the law library. Rather, he must be allowed to use the law library only if it is necessary to insure his access to the courts; otherwise, the matter is in the court's discretion. In that case we held that since the defendant was represented by counsel and made no showing that counsel needed his help in researching the law, the court did not abuse its discretion in denying him permission to use the library. (See also *In re Harrell* (1970) 2 Cal.3d 675, 695 [87 Cal.Rptr. 504, 470 P.2d 640]; *In re Allison* (1967) 66 Cal.2d 282, 289 [57 Cal.Rptr. 593, 425 P.2d 193]; *People v. Mattson* (1959) 51 Cal.2d 777, 797 [336 P.2d 937].)

Woodrow claims the court applied a "blanket policy" to the request, and that he was entitled to an "individualized exercise of the court's discretion." He argues that courts must give special protection to defendants potentially subject to the death penalty, including easier access to law libraries. (See *Keenan v. Superior Court* (1982) 31 Cal.3d 424, 430-431 [180 Cal.Rptr. 489, 640 P.2d 108].)

*Rhinehart, supra,* 9 Cal.3d 139, however, was itself a death penalty case. It is true the record in that case revealed an inquiry by the court into the defendant's qualifications and the seriousness of the facts. Abbreviated though the judge's consideration of Woodrow's request may have been, we cannot find an abuse of discretion. Woodrow was represented by competent counsel. He made no showing that use of the library was necessary for his access to the court; he merely requested such use so that he could "assist in his own defense." The judge's brief response was commensurate with the brevity of Woodrow's request.

### D. *Prosecutorial Misconduct*

Both defendants cite instances of alleged prosecutorial misconduct, and maintain that taken together these instances of misconduct deprived them of a fair trial. ■ Prosecutorial misconduct, however, does not require reversal unless it subjects the defendant to prejudice. (*People v. Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].) As will appear, we conclude that the conduct complained of either did not amount to misconduct or did not cause prejudice.

#### 1. *Implication of Facts the Prosecutor Could Not Prove*

■ It is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist. (*People v. Perez* (1962) 58 Cal.2d 229, 240-241 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946]; *People v. Lo Cigno* (1961) 193 Cal.App.2d

360, 388 [14 Cal.Rptr. 354].) Defendants point to two instances in which the prosecutor allegedly violated this rule.

The first act occurred during the questioning of Mark Sutton. When the prosecutor asked Sutton if he had heard about the Warren brothers prior to his testimony, Woodrow's counsel objected and asked to approach the bench. The prosecutor sought to demonstrate that witnesses in the case were being threatened. The court ruled that the prosecutor did not have a sufficient basis to believe in the existence of such threats, and told him he could ask the witness about knowledge of the Warren brothers but not about threats. The prosecutor's final question to Sutton was whether he was afraid as a witness in the case. Defense counsel objected, and the court admonished the jury to disregard the question because there was no basis in fact to conclude that Sutton was in fear.

We believe that the prosecutor did not act improperly in this instance. He asked the witness about fear, not threats. ■ Although evidence that a defendant is threatening witnesses implies a consciousness of guilt and thus is highly prejudicial and admissible only if adequately substantiated (*People v. Hannon* (1977) 19 Cal.3d 588, 600 [138 Cal.Rptr. 885, 564 P.2d 1203]; *People v. Weiss* (1958) 50 Cal.2d 535, 554 [327 P.2d 527]), evidence that a witness is afraid to testify is relevant to the credibility of that witness and therefore admissible. (*People v. Avalos* (1984) 37 Cal.3d 216, 232 [207 Cal.Rptr. 549, 689 P.2d 121].)

■ The next instance of the prosecutor's alleged implication of facts he could not prove involved testimony of Officer David Combs, who went through police photographs with Rebeles on the afternoon following the crime. On direct examination, Woodrow's attorney established that Rebeles had selected a picture of Lamont Bell as the tall, muscular robber. On cross-examination, the prosecutor asked Combs if people go by aliases, and if the picture Rebeles selected was also of Woodrow.

Although this was not a proper question, any possible prejudice was cured by subsequent events. Defense counsel immediately objected. The court admonished the jury there was no reason to believe the photograph was of Woodrow. Further, Bell testified that the picture was his own. And, in his closing argument, the prosecutor explained he had not meant to imply the picture was of Woodrow, but rather that it looked like him. Thus, any improper inference that the picture Rebeles selected was of Woodrow was fully and effectively removed.

### 2. *Failure to Admonish Witnesses*

■ A prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence. (*People v. Glass* (1975) 44

Cal.App.3d 772, 781-782 [118 Cal.Rptr. 797]; *People* v. *Schiers* (1971) 19 Cal.App.3d 102, 112 [96 Cal.Rptr. 330]; *People* v. *Cabrellis* (1967) 251 Cal.App.2d 681, 688 [59 Cal.Rptr. 795]; *People* v. *Figuiredo* (1955) 130 Cal.App.2d 498, 505-506 [279 P.2d 200].) If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement. (*People* v. *Schiers, supra*, 19 Cal.App.3d at p. 113.)

Defendants cite three instances in which the prosecutor allegedly violated this duty. The first occurred during the direct examination of Rudy Hicks, the boy who made extrajudicial statements to the effect that the taller, bald robber did the shooting. Rudy had spoken to a police officer at a lineup that was subsequently suppressed. The offending exchange was as follows. "Q: Did you have three conversations with Officer Iorio, that is, one in the street, one in Jeffrey Pyles' house and then the third one later the next day—A: After the lineup. Q:—down at the police station? A: After the lineup." Defendants moved for a mistrial but were unsuccessful: the court was convinced the prosecutor was surprised by Rudy's mention of the lineup, and believed any prejudice to the defendants was "miniscule"—it was the defendants who had first mentioned the lineup in their cross-examination of Mark Sutton. The record supports these determinations and we adopt them as our own.

The second alleged failure to admonish a witness involved Officer Reynolds, who interviewed Jeffrey Pyles. The prosecutor asked Reynolds if anyone else was present during his conversation with Pyles. Woodrow's counsel objected, and at the bench stated he had a "sneaky feeling" the prosecutor would attempt to elicit hearsay statements by Pyles's mother to the effect that Pyles was at home asleep during the crime. Such statements would corroborate Pyles's story that Rudy, not he, saw the shooting, and would thus support Rudy's statement to the police effectively identifying Woodrow as the triggerman. The court instructed the prosecutor to limit his questioning of Reynolds to whether Pyles's statements at home were different from his statements at the police station. The prosecutor then asked: "The conversation, the brief one that you had with Jeffrey Pyles there at the house upon your returning from the house from the station, in substance, what did he tell you there at the house?" The officer responded: "Again he told me he had been asleep in his bed and his mother said that he had—" At this point defense counsel objected.

It is clear from the quoted exchange that, as the court found, the witness blurted out the reference to Pyles's mother; the prosecutor asked precisely the question framed by the court. There was no prejudice to defendants

because the officer did not complete his answer and the jury thus did not hear what Pyles's mother said.

The final instance of alleged failure to admonish occurred during the testimony of Officer Sillers, who arrested the defendants and a person he believed to be the third robber three days after the crime in question. The prosecutor asked Sillers to describe the third man and Sillers did so, adding the detail that the man was wearing dark clothes. Several witnesses had testified that the unidentified robber wore dark clothes during the crime. Earlier mention of the clothes worn by defendants and the third man on their arrest, however, had been suppressed.

We believe that even if the prosecutor violated his duty to admonish, he did not subject the defendants to prejudice: the color of the clothes worn by the third man three days after the crime in question was immaterial.

### 3. *Other Alleged Acts of Misconduct*

Woodrow briefly cites three other instances of alleged misconduct. He claims the prosecutor misstated evidence when he asked Rudy Hicks about seeing the muscular robber walk down the street, because Rudy had not so testified. The record, however, reveals that Rudy did indeed state he saw the man walk down the street. Woodrow next challenges the prosecutor's attempt to allow Rebeles to comment on the similarity of Woodrow's tattoo and that of the tall, muscular robber. Although Rebeles never testified to a distinctive tattoo, it was not misconduct for the prosecutor to ask if Woodrow's tattoo looked familiar. Woodrow finally points out that the court rebuked the prosecutor for using improper impeachment techniques. The court, however, was merely urging the prosecutor to read from the record instead of paraphrasing what the witness had said, because it was "sloppy" to do otherwise. These examples do not constitute misconduct.

### 4. *Closing Argument*

■ Defendants' final claim of prosecutorial misconduct concerns the prosecutor's closing argument. At the outset the prosecutor commented, "I would ask you perhaps to excuse and forgive me for having an added emotion, one of a bit of anger at times. [¶] I say these things because I think that during the course of this trial there were times that perhaps some of you, if not all of you, perhaps none of you, had felt that the People were not getting a fair and impartial trial. I asked you to give the People a fair and impartial trial—" At this point the court interrupted and asked all counsel to approach the bench. There the court informed the prosecutor that his comments bordered on the contemptuous, as he was suggesting the court

had not been fair. The court admonished the jury to disregard the remark because it was improper.

Both defendants maintain the prosecutor's statement, combined with his other acts of alleged misconduct, deprived them of a fair trial. They argue the prosecutor forced defense counsel to object numerous times, giving the jury the impression that much evidence was wrongfully being kept from it. And by asserting the People were not given a fair trial, the prosecutor committed the ultimate offense: no admonition by the court could cure this misconduct because the court had been tainted as part of a conspiracy to undermine the People's case. The point must be rejected.

As explained above, defendants' numerous claims of misconduct have little merit. Further, although the prosecutor's opening comments were improper, the potential prejudice inherent therein was effectively prevented from becoming actual by what followed. The court firmly admonished the jury to disregard the offending statement. The prosecutor then continued his argument. "I would like to follow up with what the court has just said. I did not mean at any time to tell you the People were not getting a fair and impartial trial. [¶] I think, if you recall what I just said to you—I did not so state. [¶] I did state to you at sometime one or more of you might have gotten that feeling. [¶] I also stated, followed up, I state to you now that People expect a fair and impartial trial in this case, and the People expect that you will give the People just as fair and impartial trial as you will give the defendants." Accordingly, we conclude that the potential prejudice inherent in the prosecutor's comment did not become actual.

E. *Admission of Evidence That Witnesses Were Told Not to Testify*

 At trial Theresa Myles denied corroborating Rebeles's version of the crime in a statement to the police. At the preliminary hearing she testified her mother told her to "keep [her] mouth shut," but at trial she denied that her mother had made that statement. The prosecutor was allowed to impeach her. Similarly, Jeffrey Pyles was permitted to recount the substance of advice given by an older brother of Rudy Hicks: "don't snitch on anybody." Further, the prosecutor was permitted to question Steven Hicks about his reluctance to testify.

Defendants claim it was error for the court to admit the foregoing testimony. They argue that the evidence that witnesses were reluctant to testify suggested that they could identify the defendants, although they had in fact made no identification. They further argue that such a suggestion was emphasized by the prosecutor in closing argument: "Now, counsel, I suppose, will argue and say to you, you can't infer that they could have

identified the two defendants by the fact that they said they didn't or couldn't. You can't infer that. [¶] Well, I wonder if you cannot, by looking at the circumstantial evidence; and that is, the evidence that indicates there was a lot of lighting there; and when you look at what they did say they saw and when you see how outstanding the defendant, Woodrow Warren, was and is, that they could have identified. [¶] I submit to you, I believe you can, on the circumstantial evidence, make that conclusion."

We believe that it was not improper to allow the jury to draw inferences as to what the witnesses could have testified to. As the trial judge stated, "I am satisfied that the jury might infer that Steve Hicks, who sees somebody walk by him under a street light five feet away and Theresa Myles, who is sitting on the passenger side of a car, talking to her brother, and saw these people walk five feet, and Rudolph Hicks, described the defendant to a T, the jury might very well decide that these witnesses did in fact see them. [¶] But they, for one reason or another, they don't want to get involved with a shooting in their own neighborhood where the defendants live a mile away. And I don't want to tell them that in effect these witnesses cannot identify." Thus, there was a clear basis in the record for the prosecutor to argue the inference.

Defendants argue the evidence of reluctance was unduly prejudicial, as it implied they had threatened the witnesses. We do not agree. In the case before us, the admonition against testifying came from the witnesses' friends and relatives—there was no implication that defendants or their agents were involved. As the prosecutor stated in his closing argument, "so we have— am I saying by that—that I am submitting to you and arguing to you that the two defendants have threatened any witnesses or told these people not to identify anybody? [¶] Don't misunderstand me, not at all, not at all. [¶] It doesn't make any difference who has threatened, if anybody, the witnesses not to identify. [¶] The reason why it was brought out, . . . it reflects upon their credibility, as it reflects upon their not identifying anybody. [¶] I am sure every one of us would agree and realize that the two defendants, neither one of them, would have to threaten any witness not to identify. ▮▮▮▮ The very fact that a witness who lives in the neighborhood like the Hicks do and we know that also the defendants live in the neighborhood, four, five blocks away."[1]

---

[1] Defendants also argue that a prosecutor may not induce the jury to draw unreasonable inferences. A prosecutor, however, has wide discretion to argue the merits of a case, including giving his interpretation of reasonable inferences to be drawn from the evidence. (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1084-1085 [80 Cal.Rptr. 567, 458 P.2d 479].) " 'The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury.' " (*People* v. *Eggers* (1947) 30 Cal.2d 676, 693 [185 P.2d 1], quoting *People* v. *Sieber* (1927) 201 Cal. 341, 356 [257 P. 64]; see also *People* v. *Beivelman* (1968) 70 Cal.2d 60, 77-78 [73 Cal.Rptr. 521, 447 P.2d 913].)

 Thus, the evidence merely demonstrates that the witnesses and their friends and relatives wanted nothing to do with the case, and therefore was relevant to credibility. Its admission was not error.[2]

## II. SPECIAL CIRCUMSTANCE ISSUES

### A. *The Felony-murder and Multiple-murder Special Circumstances and Intent to Kill*

 Defendants contend that the felony-murder and multiple-murder special circumstances must be set aside on the ground that the court improperly instructed the jury on intent to kill. The instructions under challenge were as follows.

"To find the special circumstance, referred to in these instructions as multiple murder convictions, is true, it must be proved: [¶] 1. That the defendant has in this case been convicted of one offense of murder in the first degree and has also been convicted in this case of an additional murder in the first or second degree, and [¶] 2. That the defendant was, with respect to each and every murder conviction in this case, either the actual killer or a person who intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of murder in the first degree.

"To find that the special circumstance, referred to in these instructions as murder in the commission of robbery, is true, it must be proved: [¶] 1a. That the murder was committed while the defendant was engaged in or was an accomplice in the commission of a robbery, or [¶] 1b. That the murder was committed during the immediate flight after the commission of a robbery, [¶] And it must also be proved: [¶] 2. That the defendant was either the actual killer or a person who intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of murder in the first degree."

 In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], we held that intent to kill is not an element of the felony-murder or multiple-murder special circumstance; but, when the defendant is an aider and abetter rather than the actual killer, intent must be proved. (*Id.* at pp. 1147, 1149-1150.) Therefore, we concluded that the court must instruct on intent when there is evidence from which the jury could find

---

[2]For the foregoing reasons it was also proper for the court to refuse an instruction proposed by defendants that would have admonished the jury not to infer from the warnings that the witnesses could have identified the perpetrators of the crime.

that the defendant was an aider and abetter rather than the actual killer. (*Id.* at pp. 1147, 1150.)

Defendant Robert claims that by giving the instructions quoted above, which do not require a finding of intent to kill for the actual killer, the court committed error. We cannot agree. When, as here, all the evidence shows that the defendant either actually killed the victim or was not involved in the crime at all, under *Anderson* the court is not required to instruct on intent. (43 Cal.3d at pp. 1147, 1150.)

Defendant Woodrow also claims that the court committed instructional error. Specifically, he argues that the charge failed to inform the jurors that they were required to find that he acted with intent to kill if they determined he was not the actual killer.

▇▇▇ In deciding whether an instruction is erroneous, we ascertain at the threshold what the relevant law provides. We next determine what meaning the charge conveys in this regard. Here the question is, how would a reasonable juror understand the instruction. (E.g., *California* v. *Brown* (1987) 479 U.S. 538, 541-542 [93 L.Ed.2d 934, 940, 107 S.Ct. 837, 839].) In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. (*Id.* at pp. 541-542 [93 L.Ed.2d at p. 940, 107 S.Ct. at p. 839].) Finally, we determine whether the instruction, so understood, states the applicable law correctly.

▇▇▇ As relevant here, the law provides that before the trier of fact can make a felony-murder or multiple-murder special-circumstance finding as to a defendant who was an aider and abetter rather than the actual killer, it must determine that he acted with intent to kill. In our view, a reasonable juror would understand the language of the instructions to declare that very rule: "the defendant was . . . a person who intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of murder in the first degree." Therefore, the instructions, so understood, state the law correctly.

We recognize that in the context of this case the challenged instructions might conceivably be construed in a different manner. In delivering its charge the court defined first degree felony murder: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of robbery, and where there was in the mind of the perpetrator the specific intent to commit the crime of robbery, is murder of the first degree." Considered in light of the foregoing definition, the language of the instructions might conceivably be understood to mean that a special-circumstance

finding could be made as to an aider and abetter if he acted merely with the intent to commit robbery and not with the intent to kill.

Nevertheless, we believe that the instructions here would not be so construed by a reasonable juror. As shown above, one could understand the charge as requiring intent to rob and nothing more only if he parsed it in a hypertechnical manner. A reasonable juror, however, would not undertake such tortuous analysis.

In conclusion, we hold that by instructing the jury as it did on the felony-murder and multiple-murder special circumstances and the issue of intent to kill, the court did not commit error.

B. *Limiting Instruction on Rudy Hicks's Extrajudicial Identification of the Triggerman*

■■■ Defendant Robert contends that the giving of a certain instruction requires the setting aside of the special circumstances as to him. At trial, the court ruled admissible as to Robert, but not as to Woodrow, extrajudicial statements that Rudy Hicks made to the police and to Jeffrey Pyles effectually identifying Woodrow as the triggerman. In accordance with this ruling the court delivered the following instruction: "In determining the truth or falsity of the special circumstance allegation[s] as charged against Defendant Woodrow Warren, you are instructed to disregard totally all out of court statements made by Rudolph Hicks to police officers or to anyone else to the effect that Defendant Woodrow Warren was the actual killer who did the shooting; however, you may consider those statements for whatever value they may have in deciding the truth or falsity of the charged special circumstance allegations as against Defendant Robert Warren."

Robert claims that the instruction quoted above amounts to a comment on the evidence on the part of the court, and that such "comment" is objectionable on the ground that it presented Rudy's testimony as lacking in credibility and thereby essentially directed the jury to find that he was the triggerman. The point must be rejected out of hand.

To begin with, we believe that the instruction did not amount to a comment on the evidence, but was simply what it purported to be, i.e., a charge on the use of hearsay that the court determined to be admissible as to Robert but inadmissible as to Woodrow. More important, the instruction did not present Rudy's testimony on the identity of the triggerman as lacking in credibility. Rather, it merely directed the jurors to consider that testimony and to decide for themselves whether or not it was worthy of belief.

Accordingly, we are of the opinion that the court did not err in giving the instruction under challenge.

### C. *"Multiple" Multiple-murder Special-circumstance Allegations*

 Defendants contend that it was error for the prosecution to allege two multiple-murder special circumstances instead of one. They are correct. (*People* v. *Anderson, supra*, 43 Cal.3d at p. 1150.) It follows that one of the multiple-murder special-circumstance findings must be vacated.

### III. Penalty Issues

 Defendants persuasively contend that the court committed reversible error under *People* v. *Ramos, supra*, 37 Cal.3d 136. In accordance with the so-called Briggs Instruction, the court delivered the following unqualified charge: "You are instructed that under the State Constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole."

In *People* v. *Ramos, supra*, 37 Cal.3d at page 153, we held that "the Briggs Instruction is incompatible with [the] guarantee of 'fundamental fairness' [established in the due process clauses of our Constitution (Cal. Const., art. I, §§ 7, 15)] both because it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations."

Consequently, in *People* v. *Anderson, supra*, 43 Cal.3d 1104, 1150-1151, we held that when a court charges the jury in accordance with unadorned Briggs Instruction, it commits serious error and necessarily subjects the defendant to prejudice. (Cf. *People* v. *Hamilton* (1988) 45 Cal.3d 351, 372-376 [247 Cal.Rptr. 31, 753 P.2d 1109] (dealing with a qualified Briggs Instruction).)

Therefore, we conclude that the court committed reversible error by charging the jury in accordance with an unqualified Briggs Instruction. As to each defendant, the judgment of death must therefore be reversed.

As to each defendant, the judgment is affirmed as to guilt. As to each defendant, one of the multiple-murder special-circumstance findings is vacated and the remainder of the special-circumstance findings are upheld. As to each defendant, the judgment is reversed as to penalty.

Lucas, C. J., Panelli, J., and Eagleson, J., concurred.

ARGUELLES, J.—I fully concur with the majority's reasoning and disposition with one exception. Instead of concluding, as does the majority, *ante*, at pp. 486-487, that the jury instructions regarding the special circumstance allegations were adequate under *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], I would decline to reach that question. While the trial court's instructions were clearly adequate under *Anderson* for *Robert* since the evidence showed he fired the murder weapon, I believe there is a serious question whether the instructions satisfactorily informed the jury it must find *Woodrow* intended to kill before sustaining the two special circumstance allegations against him. Since one may intentionally aid a killer without necessarily harboring the intent to kill (cf. *People* v. *Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318]), it is arguable that the trial court's instructions, so far as they apply to Woodrow, did not fully satisfy the dictates of *Anderson*.

However, we need not resolve that question since even assuming arguendo the instructions were inadequate, reversal would not be warranted in this case. On this record, it is clear no reasonable jury could have concluded Woodrow intentionally aided the crime without intending to kill. (Cf. *People* v. *Croy* (1985) 41 Cal.3d 1, 13-14 [221 Cal.Rptr. 592, 710 P.2d 392].) Most significant is the evidence showing Woodrow answered in the affirmative when Robert asked "Can I shoot?" This evidence clearly betrays Woodrow's intention not merely to aid in the criminal enterprise but to kill as well. Inasmuch as we need not pass on the adequacy of the jury instructions on the facts of this case, I would decline to do so.

With this one reservation, I concur in the majority decision.

Broussard, J., concurred.

KAUFMAN, J.—I concur in the concurring opinion by Justice Arguelles except that my concurrence in reversal of the death penalty is under compulsion of *People* v. *Ramos* (1984) 37 Cal.3d 136, 153-159 [207 Cal.Rptr. 800, 689 P.2d 430] and *People* v. *Montiel* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248].

The petition of appellant Warren for a rehearing was denied July 28, 1988.