Filed 1/20/16  P. v. Correa CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GARY GEORGE CORREA, JR.,<br><br>    Defendant and Appellant. | H041685<br>(Santa Clara County<br>Super. Ct. No. C1243701) |

Defendant Gary George Correa, Jr., was convicted after a jury trial of theft or unauthorized use of a vehicle (Veh. Code, § 10851, subd. (a)), buying or receiving a stolen vehicle (Pen. Code, § 496d),[1] and evading a police officer with reckless driving (Veh. Code, § 2800.2, subd. (a)).  On appeal, defendant argues that the prosecutor committed misconduct when she elicited testimony from two witnesses that inferred that he had a prior criminal history.  He also claims that the trial court erred when it modified the jury instruction regarding eyewitness identification (CALCRIM No. 315).  For the reasons set forth below, we reject defendant's arguments and affirm the judgment.

**BACKGROUND**

*The Information and the Motions in Limine*

On October 3, 2013, the Santa Clara County District Attorney's Office filed an information charging defendant with one count of theft or unauthorized use of a vehicle (Veh. Code, § 10851, subd. (a)), one count of buying or receiving a stolen motor vehicle

_____

[1] Unspecified statutory references are to the Penal Code.

(§ 496d), and one count of evading a police officer with reckless driving (Veh. Code, § 2800.2, subd. (a)). It was further alleged that defendant had two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12) and had served a prior prison term (§ 667.5, subd. (b)).

Before trial, the People moved in limine to introduce evidence of defendant's prior conviction for attempted robbery. The court denied the motion, but granted the People's motion to introduce the conviction as impeachment evidence should defendant testify on his own behalf. Later, defense counsel requested that the court order the prosecutor to warn the officers not to mention that they knew defendant from prior contacts, since one of the testifying officers knew defendant from a prior arrest. In response, the prosecutor stated that she was not going to "go into specifics" regarding how the officer was familiar with defendant, but was going to ask him generic questions such as, "Are you familiar with [defendant]," "Do you see [defendant] in court today," or "Officer, do you know [defendant]." The court stated that it agreed that "[i]f [the questions are] phrased that way, that's fine."

On May 28, 2014, defendant's trial commenced.[2]

*The Evidence at Trial*

On October 12, 2012, Jose Manriquez parked his car, a white Toyota Camry, on the street outside his house in the afternoon. The following morning, his car was gone. On the morning of October 13, 2012, Josefina Singh parked her car, a burgundy Toyota Camry, in a parking lot.[3] When she returned approximately eight hours later, her car was gone.

---

[2] On January 6, 2014, the trial court declared a mistrial in defendant's first trial after discovering a conflict with defendant's trial counsel. On May 28, 2014, defendant's second jury trial commenced.

[3] Some parts of the record characterize the car's color as "maroon." We refer to the car color as "burgundy" for consistency.

2

San Jose Police Department Detective Michael Cristol was assigned to the regional auto theft task force at the time of the thefts. Cristol was asked to investigate a white Toyota Camry and a burgundy Toyota Camry that were parked in a neighborhood that frequently had auto thefts and burglaries. Cristol checked the cars and determined that they had been reported stolen. He then inspected the cars and concluded that it was unlikely that whoever stole the white Camry would come back to drive the car, because it was low on gas. However, he believed that someone may come back to drive the burgundy Camry.

Detective Cristol had the white Camry taken to another location for processing. He left the burgundy Camry where it was, and other officers took over the surveillance of the car. At the processing location, Cristol found fingerprints on the white Camry's rear view mirror and the driver's side view mirror. He did not check for fingerprints on the passenger's side of the car.

Officer Tony Diep was on patrol when he saw someone driving the burgundy Camry, and he noticed that the car failed to stop at a stop sign when making a turn. Diep was on the opposite side of the road as the burgundy Camry. When his car passed the burgundy Camry, Diep said that he turned on his spotlight so he could see the driver. He then activated his lights, turned around, and began pursuing the car. During the chase, Diep illuminated his lights a second time and saw the driver again.

At a certain point, Officer Diep concluded that it would be too dangerous to continue pursuing the burgundy Camry. He continued to follow the car at a distance and eventually found the car abandoned. The burgundy Camry was not fingerprinted.

The fingerprints found on the white Camry's inside rearview mirror matched Destiny Salcedo's right and left thumb prints. The fingerprints found on the driver's side view mirror matched defendant's index finger and left thumb print.

3

A few days later, Detective Cristol contacted Officer Diep. Diep said he could identify the driver of the burgundy Camry. Cristol gave Diep defendant's name, personal file number (PFN), and date of birth so that Diep could find defendant's photograph. During trial, both Diep and Cristol testified that a PFN is a unique identifier for individuals who have ever been arrested or booked into county jail. Diep confirmed that defendant was the driver of the burgundy Camry. Both officers testified that law enforcement officers are given specialized training to help make accurate and reliable identifications of suspects.

*The Verdict and Sentencing*

The jury was instructed with CALCRIM No. 315, which instructs the jury on evaluation of eyewitness identifications. The People requested that CALCRIM No. 315 be modified to insert the phrase "training and experience" so that the instruction would ask the jury to consider "circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, duration of observation, and *training and experience*." Over defendant's objection, the court made the requested modification.[4]

On June 10, 2014, the jury found defendant guilty on all counts. In a separate court trial, the trial court found the prior convictions and prior prison allegation to be true. Defendant filed a motion under *People Superior Court* (*Romero*) (1996) 13 Cal.4th 497, which the trial court denied. Defendant was sentenced to five years four months in prison.

---

[4] Initially, the trial court asserted that it would modify the instruction to include the phrase "training and experience." However, the copies of the jury instruction in the record and the oral pronouncement of the jury instructions reflect that the court actually modified CALCRIM No. 315 to include the phrase "training *or* experience." Regardless, our analysis of the issues raised on appeal would be the same.

4

1. *Prosecutorial Misconduct*

Defendant argues that the prosecutor committed misconduct when she asked the officers questions regarding defendant's PFN. Defendant claims that the prosecutor deliberately elicited testimony regarding defendant's prior criminal history despite the trial court's earlier ruling to exclude such evidence.

a. **Defendant Forfeited Claim of Misconduct**

The People argue that defendant has forfeited his argument of prosecutorial misconduct. Typically, " '[t]o preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*People v. Silva* (2001) 25 Cal.4th 345, 373.) Here, defendant did not object to the elicited testimony, nor did he request an admonishment.

There are, however, exceptions to this general rule of forfeiture. A defendant will be excused from making a timely objection and request for admonition if either would have been futile, or if the admonition would not have cured the harm caused by the misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 820-821.) Defendant argues that this exception applies, because raising an objection and requesting an admonition would have merely drawn more attention to the fact that he had a prior criminal history.

We disagree. Defendant's argument "would swallow the rule requiring a timely objection and request for admonition, for one always runs the risk of drawing the jury's attention to an improper line of argument by registering an objection. The mere concern of highlighting alleged misconduct by objecting, without more, cannot serve as an exception to the general rule requiring an objection and request for admonition." (*People v. Boyette* (2002) 29 Cal.4th 381, 432.) Further, there is nothing in the record to support defendant's claim that raising an objection would have been futile or that the trial

court would have been inclined to overrule an objection. (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.)

Additionally, defendant does not convince us that an admonition would not have cured the alleged harm. Officer Diep and Detective Cristol testified that a PFN is a number given to individuals who are booked into county jail or arrested. However, neither Diep nor Cristol went into detail regarding defendant's personal criminal history. They did not specifically testify that defendant was arrested, charged, or previously convicted of any crime. We do not believe the officers' statements were so inflammatory or revelatory that a timely admonition would have been ineffective.

For example, in *People v. Valdez* (2004) 32 Cal.4th 73, 123, the defendant argued that the prosecutor committed misconduct when he elicited testimony from a witness that defendant had been in jail. (*Ibid.*) Our Supreme Court, however, concluded that this witness's "fleeting reference to 'jail' was not 'so outrageous or inherently prejudicial that an admonition could not have cured it.' " (*Ibid.*) And, another witness made an isolated reference to the fact that the defendant was previously in the "Chino Institute," which reflected his custodial status. (*Id.* at p. 124.) Again, our Supreme Court concluded that this other witness's reference to the Chino Institute "was not so grave that a curative instruction would not have mitigated any possible prejudice to defendant." (*Id.* at p. 125.) Ultimately, the *Valdez* court concluded that the defendant had forfeited his argument of misconduct.

Similarly, in *People v. Avila* (2006) 38 Cal.4th 491, 572-574, a codefendant's statement that the defendant had " 'barely got[ten] out of prison' " (*id.* at p. 572) when he committed the crimes was not found to be incurable by an admonition. In *People v. Bolden* (2002) 29 Cal.4th 515, 554-555, our Supreme Court also determined that a witness's brief statement that he received information about the defendant from a parole officer did not deprive the defendant of the ability to receive a fair trial.

6

Applying the standards set forth above, we do not believe that an admonition would have failed to cure any resulting prejudice. The references the officers made to defendant's prior criminal history were fleeting and no more inflammatory than the statements contemplated in *Valdez*, *Avila*, and *Bolden*. Therefore, defendant's failure to request an admonition forfeited his claim of misconduct.

We also reject defendant's argument that we should nevertheless entertain the merits of his prosecutorial misconduct claim by exercising our discretion to consider an inadequately preserved issue. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) Although appellate courts have the discretion to entertain forfeited claims, this discretion is typically reserved for those cases that involve either an important issue of constitutional law or a substantial right. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7.) Neither of these situations is present here.

However, even if we find that defendant forfeited his claims, we must evaluate whether his trial counsel's failure to object to the alleged misconduct amounted to ineffective assistance of counsel. Accordingly, we address the merits of his claim of misconduct to determine if his defense counsel rendered ineffective assistance.

b. **Overview of Ineffective Assistance of Counsel Claims**

In order to establish his trial counsel was ineffective, defendant must show his counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and his counsel's deficient representation subjected him to prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) Prejudice in this context means that but for his counsel's deficiencies, the result of the proceedings would have been favorable to the defendant. (*Ibid.*) A reasonable probability is one that is sufficient to undermine confidence in the verdict. (*Id.* at p. 694.)

"We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15

7

Cal.4th 619, 703.) Therefore, we reverse " 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 980.) We may dispose of an ineffectiveness claim if defendant fails to demonstrate prejudice without determining whether his trial counsel's performance was deficient. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697.)

Therefore, we first review the statements elicited by the prosecutor to determine if there was any misconduct amounting to reversible error. In the absence of such misconduct, defendant's claim of ineffective assistance of counsel would fail for lack of prejudice.

c. **Legal Principles Governing Prosecutorial Misconduct Claims**

Misconduct involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. (*People v. Haskett* (1982) 30 Cal.3d 841, 866.) " ' "It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' [Citations.]" [Citation.] Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected.' [Citation.] However, a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated." (*People v. Tully* (2012) 54 Cal.4th 952, 1035.)

Further, "[a] prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence. [Citations.] If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement." (*People v. Warren* (1988) 45 Cal.3d 471, 481-482 (*Warren*).)

"[A] prosecutor commits reversible misconduct . . . when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does

8

not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on a different ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

d. **No Prosecutorial Misconduct Occurred**

First, we note that the parties dispute whether the court actually prohibited introduction of any reference to defendant's criminal background or ordered the prosecutor to warn the witnesses to refrain from commenting on defendant's criminal history. Prior to trial, the defense filed a motion seeking to exclude evidence of defendant's prior bad acts, arguing these acts were not admissible under Evidence Code section 1101, subdivision (b) and would be more prejudicial than probative. The People filed its own motion seeking to introduce evidence of a prior conviction of attempted robbery. The reporter's transcript of the hearing and the minute order indicate that the court denied the People's motion to introduce evidence of the prior conviction under Evidence Code section 1101, subdivision (b) but granted the People's motion to impeach defendant with the prior conviction should he testify. During the pretrial hearing, the court made no ruling on defendant's motion to exclude evidence of defendant's prior bad acts.

Before trial, defense counsel also requested that the court ask the prosecutor to warn the officers that they should not mention that they knew defendant from prior contacts. Defense counsel specifically stated that this request was not included in the original motion in limine. In response, the prosecutor stated that she was not going to "go into specifics" regarding how Detective Cristol was familiar with defendant, but was going to ask him generic questions such as, "Are you familiar with [defendant]," "Do you

9

see [defendant] in court today," or "Officer, do you know [defendant]," in order to identify defendant for the record. The court did not specifically order the prosecutor to warn the witnesses as requested and merely stated that it agreed that "[i]f [the questions are] phrased that way, that's fine."

Based on the record before us, it is not clear whether the trial court ordered the prosecutor to avoid making references to defendant's criminal background or to warn the witnesses to refrain from discussing defendant's criminal history. If the prosecutor did not violate the court's order, there was no need for defense counsel to make meritless objections at trial. Failure to make a meritless objection cannot cause a defendant prejudice. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1038.) Accordingly, defendant's claim of ineffective assistance of counsel would fail.

Additionally, even if we assume that the trial court ordered exclusion of all mention of defendant's criminal background, we would still find no misconduct. Based on the questions the prosecutor posed to the witnesses, we do not find the prosecutor intentionally elicited information about defendant's criminal history.

During trial, Detective Cristol testified that he gave Officer Diep defendant's PFN. On redirect examination, the prosecutor asked Cristol whether a PFN was "a number that's unique to a photograph or unique to an individual?" Cristol responded that "[w]hen somebody's arrested for the very first time, whether as a juvenile or an adult, they're assigned a PFN. That number is, in this case, three letters and three numbers. It sticks with them for the rest of their life. It's kind of like the same way an I.D. works or a driver's license number."

When questioning Officer Diep about his conversation with Detective Cristol, the prosecutor asked Diep: "When the two of you were talking about, can you identify somebody, what was the next step?" Diep responded: "I believe he forwarded or gave me a photo or a Personal File Number which is a number that anybody that has ever been

10

booked in the Santa Clara County jail would be assigned to them and only them. It's like a Social Security number for the booking process."

Although it is misconduct for a prosecutor to intentionally elicit inadmissible testimony from witnesses (*People v. Tully*, *supra*, 54 Cal.4th at p. 1037), based on the questions posed by the prosecutor, no misconduct occurred. First, the prosecutor's question to Detective Cristol was not inherently likely to elicit a discussion of defendant's criminal history. The prosecutor merely asked Cristol whether a PFN is unique to a photograph or to an individual. She did not ask if the PFN was an identifier that was only assigned to those who were booked into county jail or arrested. She also did not ask how a PFN is generated. It is dubious to believe that the prosecutor somehow anticipated that Cristol would go beyond the confines of the question to explain that a PFN relates to an arrest or being booked into county jail.

Similarly, the prosecution's question to Officer Diep does not logically trigger a response regarding defendant's criminal history. The prosecutor asked Diep about the identification process that took place and about the conversation that Diep had with Detective Cristol about identifying defendant. The prosecutor never asked Diep for an explanation of a PFN.

Defendant argues that even if the prosecutor did not intentionally elicit the information from the officers, she failed in her duty to warn them to refrain from giving inadmissible testimony. (*Warren*, *supra*, 45 Cal.3d at pp. 481-482.) He contends that the prosecutor's failure to warn is clearly demonstrated in the record, because the two officers made references to the fact that defendant had a criminal history.

We disagree. These facts could either indicate that the prosecutor did admonish the officers but the admonition was disregarded, or that the prosecutor failed to admonish the officers. We simply do not know what transpired between the prosecutor and the officers and have no way of knowing whether the prosecutor did indeed fail to warn

11

them.  (Compare *People v. Leonard* (2007) 40 Cal.4th 1370, 1405-1406 [finding no misconduct when record did not reflect that prosecutor had reason to believe witness would refer to excluded evidence and record did not reflect what prosecutor said to witness before he testified] with *People v. Glass* (1975) 44 Cal.App.3d 772, 781-782 [finding counsel's behavior inexcusable when counsel explicitly failed to follow trial court's order to instruct witness not to discuss a certain subject].)  Based on the record before us, there is no evidence the prosecutor committed misconduct.[5]

Accordingly, defense counsel's failure to object to the prosecutor's questions did not amount to ineffective assistance of counsel.  (*People v. Thomas* (1992) 2 Cal.4th 489, 531.)  Again, failure to make a meritless objection causes a defendant no prejudice.  (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1038.)

2.  *Trial Court's Modification of CALCRIM No. 315*

Defendant claims the trial court erred when it modified the jury instruction on eyewitness identification (CALCRIM No. 315) to include a reference to "training or experience" as a factor the jury could consider when evaluating identification testimony.

a.  **Testimony Regarding Officers' Training and Experience in Making Eyewitness Identifications**

During the trial, Officer Diep testified about the training and experience he had received to become a police officer.  Diep said that as part of the testing process, he was required to look at pictures of individuals and then try to identify them at a later time.  Diep also testified that between 2009 and 2012, he was assigned to a unit in the police force where he was the primary officer responsible for making positive or negative

---

[5] Defendant's claim of ineffective assistance of counsel is therefore based in part on matters that are outside of the appellate record.  " ' "[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged . . . ," the claim on appeal must be rejected.' "  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)  "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding."  (*Id.* at pp. 266-267.)

identifications for particular subjects. Diep asserted that he was "able to do that pretty much a hundred percent of the time," and he did not believe he ever made a false identification.

Officer Diep also testified that during his police training he was told to look at certain key features of individuals, including the proximity of their eyes, whether they have a scar or tattoo, and how their "nose connects to the mouth and eyes . . . ." Diep explained that he was trained to look at focal points that do not change. Diep said he noticed defendant's "[d]roopier eyes and [his] sharp, pointier nose."

Detective Cristol had also testified that officers are "trained observer[s]," explaining that they are instructed to look for distinct facial characteristics and parts of a person's face that cannot be changed.

b. **The Trial Court's Modification of CALCRIM No. 315**

CALCRIM No. 315 instructs the jury on how to evaluate eyewitness identification testimony. The instruction informs the jury that "[a]s with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony." The instruction then tells the jury to consider various questions when making its determination, including: "What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, [and] duration of observation[, and ___ <insert any other relevant circumstances>]?" On a separate line, the instruction also has a blank where other relevant factors raised by the evidence can be asserted. Here, the court modified CALCRIM No. 315 over defendant's objection to insert the phrase "training or experience," so the instruction asks the jury to consider "circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, duration of observation, and *training or experience*."

13

c. **The Modification Was Not Improper**

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) A trial court must instruct on general principles of law relevant to the issues raised by the evidence (*People v. St. Martin* (1970) 1 Cal.3d 524, 531), but it must "refuse an argumentative instruction, that is, an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)

Our Supreme Court considered the appropriateness of eyewitness identification jury instructions in *People v. Wright* (1988) 45 Cal.3d 1126 (*Wright*). In *Wright*, the court held that "a proper instruction on eyewitness identification factors should focus the jury's attention on the facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence." (*Id.* at p. 1141.) However, "[t]he instruction should *not* take a position as to the *impact* of each of the psychological factors listed . . . . An instruction that 'explained' the influence of the various psychological factors would of necessity adopt the views of certain experts and incorporate the results of certain psychological studies while discounting others. It would require the trial judge to endorse, and require the jury to follow, a particular psychological theory relating to the reliability of eyewitness identifications. Such an instruction would improperly invade the domain of the jury, and confuse the roles of expert witnesses and the judge." (*Ibid.*)

*Wright* concluded that an appropriate instruction should therefore "list the applicable factors in a neutral and nonargumentative instruction, thus effectively informing the jury without improperly invading the domain of either jury or expert witness. It should list only factors applicable to the evidence at trial, and should refrain from being unduly long or argumentative." (*Wright*, *supra*, 45 Cal.3d at p. 1143.)

14

Defendant argues the trial court's modification of CALCRIM No. 315 was improper, because "training or experience" is not one of the factors impacting eyewitness identification discussed in *Wright*, *supra*, 45 Cal.3d 1126 or *People v. West* (1983) 139 Cal.App.3d 606 (*West*).[6] We disagree. As indicated by the discussion in *Wright* and the instruction itself, the factors for a jury to consider when evaluating eyewitness identification are not finite and discrete. *Wright* held that a jury can be appropriately instructed on "relevant factors supported by the evidence" (*Wright*, *supra*, at p. 1141), so long as the instruction is neutral and nonargumentative. (*Id*. at pp. 1141-1143.) Further, there is a blank line in CALCRIM No. 315 for a court to include other relevant factors that are supported by the evidence at trial.

In this case, both Officer Diep and Detective Cristol had testified that they had received training on identifying suspects by looking at facial features that are difficult to change. Accordingly, the officers' training and experience were relevant factors that were supported by the evidence at trial.

We find the reasoning set forth in *People v. Johnson* (1992) 3 Cal.4th 1183 (*Johnson*) instructive. In *Johnson*, the defendant challenged modification of CALJIC No. 2.92 (the predecessor to CALCRIM No. 315) to include the witness's certainty or uncertainty of the identification as a factor to consider in assessing eyewitness testimony. (*Id*. at p. 1231.) Defendant argued the instruction was not supported by evidence in the record, because the defendant's expert witness had testified without contradiction that a witness's certainty does not positively correlate with the accuracy of the identification. (*Ibid*.) The *Johnson* court concluded that the modification was proper, because the jury

_____

[6] *Wright* and *West* include a list of various factors for a jury to consider, including, among others, the circumstances under which the original observation was made, the length of time the witness had to make the original identification, and any evidence relating to the witness's opportunity to observe the alleged criminal act. (*Wright*, *supra*, 45 Cal.3d at p. 1139; *West*, *supra*, 139 Cal.App.3d at p. 609.)

15

was free to disbelieve the expert witness testimony. Further, the jury had been instructed that they could consider the expert's testimony, so the jury could infer that the eyewitness's identification was not necessarily accurate if they were persuaded by the expert witness's testimony. (*Id.* at pp. 1231-1232.)

Here, the eyewitness, Officer Diep, testified regarding his training and experience in making eyewitness identifications. Ultimately, it was up to the jury to decide whether Diep's testimony about his training was credible, and to conclude for themselves whether his training had an impact on the reliability of his identification. The jury was instructed with CALCRIM No. 333, which provides the instruction on how to evaluate nonexpert opinions. CALCRIM No. 333 tells the jury that they may disregard "all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence." Inclusion of "training or experience" in CALCRIM No. 315 in a nonargumentative manner was therefore appropriate.

Defendant opines that the addition of the words "training or experience" impermissibly conveyed an inference that Officer Diep's identification of defendant was somehow more accurate. Defendant points out that our Supreme Court rejected the defendant's request for a special instruction in *Wright*, *supra*, 45 Cal.3d at page 1135. The special instruction requested in *Wright* listed certain specific items of evidence introduced at trial, such as the fact that all of the robbers wore masks, and advised the jury that it may consider such evidence when determining whether the defendant was guilty beyond a reasonable doubt. (*Ibid.*) The Supreme Court rejected the instruction as argumentative, and disapproved of " 'the common practice [of] select[ing] certain material facts, or those which are deemed to be material, and endeavoring to force the court to indicate an opinion favorable to the defendant as to the effect of such facts, by incorporating them into instructions containing a correct principle of law.' " (*Ibid.*) Defendant posits that the modification to CALCRIM No. 315 is akin to the special

16

instruction rejected in *Wright*, because it impliedly told the jury that the officers' training and experience should be considered when evaluating eyewitness testimony, rendering Diep's identification is more reliable.

We disagree. The eyewitness identification instruction given here is different than a special pinpoint instruction that conveys an argumentative tone. *Wright* itself acknowledged that "a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence." (*Wright*, *supra*, 45 Cal.3d at p. 1141.) On the other hand, the *effect* of factors affecting eyewitness identification "is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*Id.* at p. 1143.)

That is exactly what transpired here. The modified version of CALCRIM No. 315 asked the jury to consider the circumstances affecting the witness's ability to observe, including the officers' training or experience. This was stated in a neutral, nonargumentative tone. The *effect* of the officers' training or experience, however, was properly argued by counsel. The prosecutor argued that Officer Diep's training and experience allowed him to make an accurate identification. Defense counsel questioned whether training or experience truly allowed Diep the ability to identify defendant just by seeing his face for a short period of time.

Further, defendant's citations in his opening brief to resources disputing the accuracy of police identifications are of no relevance. It does not appear that any of this evidence was introduced at trial, and the defense did not present any expert witnesses or evidence disputing the efficacy of police training when making identifications. Even if such evidence was presented, modification of the jury instruction would not have been necessarily inappropriate under *Johnson*, because the jury would be free to disbelieve

17

expert testimony on the subject. (*Johnson*, *supra*, 3 Cal.4th at pp. 1231-1232.) Accordingly, we find the court did not err when it modified CALCRIM No. 315.

### d. **The Modification Was Not Prejudicial**

Additionally, even if we were to conclude that the court erred in modifying the jury instruction, the error was harmless.

We review instructional errors that do not violate a defendant's federal constitutional rights under the *Watson* standard of review; that is, whether there is a reasonable probability that defendant would have received a more favorable result absent the error.[7] (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Wright*, *supra*, 45 Cal.3d at p. 1144 [holding that failure to give eyewitness identification instruction under CALJIC No. 2.92 reviewable under *Watson* standard].)

As the People note, CALCRIM No. 315 instructed the jury to consider if there were "any other circumstances affecting the witness's ability to make an accurate identification." Accordingly, exclusion of the phrase "training or experience" in the jury instruction would not have prevented the prosecutor from arguing that Officer Diep's training as a police officer made his identification more reliable. Nor would it have precluded the jury from considering Diep's training when evaluating his identification of

---

[7] Defendant argues that we should apply the more stringent standard of review stated in *Chapman v. California* (1967) 386 U.S. 18, 24, which requires reversal of the judgment unless the People prove beyond a reasonable doubt that the error complained of did not contribute to the verdict. The *Chapman* standard, however, applies in situations where a defendant's federal constitutional rights have been violated. For example, "instructional error that improperly describes or omits an element of an offense . . . falls within the broad category of trial error subject to *Chapman* review." (*People v. Flood* (1998) 18 Cal.4th 470, 502-503.) Here, the alleged instructional error does not relieve the prosecution from proving an element of an offense, and it does not rise to the level of violating defendant's federal constitutional right to due process. Accordingly, we apply the *Watson* standard of review.

defendant.  And, the prosecutor did in fact argue during closing argument that Diep's training and experience led to a more accurate identification.

Defendant disagrees.  Although he concedes that the jury would have been able to consider Officer Diep's training and experience without the modified instruction, he posits that the trial court's modification essentially conveyed to the jury that Officer Diep's training and experience "bore on the reliability of his identification" and "weigh[ed] in favor of Officer Diep's identification."  We disagree with defendant's interpretation.  CALCRIM No. 315 does not instruct the jury that the factors listed bear on an eyewitness's reliability, or that certain factors make an eyewitness's identification more or less accurate.  It instructs the jury to *consider* certain factors when evaluating whether the eyewitness gave truthful and accurate testimony.  It did not, as defendant suggests, give an improper inference that the jury should find Diep's training and experience made his identification inherently more reliable.

Accordingly, the modification of the jury instruction was not prejudicial, since it is not reasonably probable defendant would have received a more favorable result absent the alleged error.

## DISPOSITION

The judgment is affirmed.

19

_____
                      Premo, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Márquez, J.


People v. Correa
H041685