Filed 4/15/13  P. v. Preciado CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B236625 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA091651) |
| v. | |
| GERARDO PRECIADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Mars, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Gerardo Preciado, appeals his conviction for attempted murder and assault with a firearm, with firearm and great bodily injury enhancements (Pen. Code, §§ 664/187, 245, 12022.5, 12022.53, 12022.7).[1] He was sentenced to state prison for 32 years to life.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

On August 13, 2010,[2] Andy Macias was living on Washington Avenue in El Monte. Around 9:00 p.m. that night, he was riding his bicycle in front of his house and socializing with friends. His brother, Danny, and a friend, Octavio Quiroz, were also there. Gunshots suddenly rang out. Andy testified the shots came from behind him and he felt a burning pain in his right side. He dropped his bicycle, stumbled across the street and collapsed in his front yard.

Danny testified he saw a man who was holding a gun, and pacing back and forth. Danny then saw the gunman drive away in a Chevy Silverado truck. Danny was 50 percent sure the gunman was defendant Preciado.

Quiroz testified he saw a Chevy Silverado truck parked in front of his own vehicle. After the shots were fired, Quiroz saw Preciado standing about 10 feet away from Andy. Quiroz then got into his vehicle and Preciado walked past the passenger window holding a gun. Preciado was the only person Quiroz saw with a gun that night. At trial, Quiroz testified he was certain it was Preciado whom he had seen with the gun.

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     All further date references are to the year 2010 unless otherwise specified.

2

Detective Ralph Batres was the first officer to arrive at the scene. He found Andy on the ground surrounded by family members. The area was lit by streetlights. Five expended .45-caliber cartridge casings and a single expended bullet were found at the shooting scene. The cartridge casings had been fired from a semiautomatic handgun.

The next day, Quiroz's cousin gave him a telephone number, which Quiroz turned over to the El Monte Police Department. A day or two later, a man approached Andy's mother and gave her a piece of paper with a phone number on it which she turned over to the El Monte police. The telephone numbers were identical. Detective Batres determined this telephone number was associated with a cell phone account operated by Sprint Nextel for a customer named Gerry Preciado. On August 16, Batres obtained GPS information from Sprint Nextel which fixed the cell phone's current physical location at a house in Montclair. Batres turned all this information over to Detective Adam Girgle, who assembled a six-pack photo array that included defendant Preciado's picture. Andy told Girgle he could identify the gunman, so Girgle showed him the photo array. Andy picked out Preciado.

Girgle and other officers established a containment perimeter around the Montclair house. A Chevy Silverado truck was parked in front. A woman came out of the house and gave officers the telephone number for the house's land line. Girgle called the land line and the cell phone number about 30 times. Finally, after 45 minutes, Preciado surrendered.

When officers searched Preciado's bedroom, they discovered a duffle bag containing copies of his tax returns. Also inside the duffle bag was a plastic medicine bottle containing .45-caliber bullets. This ammunition was the same caliber and made by the same manufacturer as the expended cartridge casings found at the shooting scene.

Detective Girgle interviewed Preciado at the police station. Preciado said he left work about 6:30 or 7:00 p.m. the day of the shooting and drove to Washington Avenue in his truck. He visited a friend and stayed an undetermined amount of time.

3

He denied having gotten into a fight with anyone. He also denied owning a gun or any ammunition. When Girgle said police had found .45 caliber bullets inside the duffle bag, Preciado denied knowing there had been any ammunition inside his house.

At trial, Andy testified he did not see who shot him, nor did he see anyone with a gun that night. He denied having identified the gunman from a photo array. He testified he did not recognize Preciado from around the neighborhood.

Girgle showed the photo array to Quiroz, who identified Preciado as the gunman. But Quiroz did not want to testify because he was concerned about his family's safety. Preciado's brother had approached Quiroz and said they had court papers indicating he was an informant. When Quiroz failed to attend a court proceeding, officers were sent to take him into custody but Quiroz fled. He told a defense investigator he did not want to testify for security concerns. Quiroz acknowledged having previously testified[3] he had not seen the gunman, but that after the judge told him perjury was a felony, he identified Preciado as the only person he had seen with a gun the night of the shooting.

2. *Defense evidence.*

Preciado testified he worked as a carpenter, he lived in Montclair and he drove a tan Silverado truck. He had grown up in El Monte and he visited Washington Avenue once or twice a month. He was acquainted with both Andy and Danny; Andy had worked for him once or twice as a day laborer. Preciado had also met Quiroz a few times and once offered him a job.

On the day of the shooting, Preciado drove to Washington Avenue around 5:00 p.m. to visit an acquaintance. He saw Andy, but they did not have any contact. Preciado was hanging out with a group of people down the street from Andy's house; he stayed a few hours and then went home. He did not have a gun, he did not shoot Andy, and he had not been present when the shooting occurred.

---

[3]     This was at Preciado's first trial, which ended in a hung jury.

4

Preciado testified he had put the .45-caliber ammunition inside the plastic medicine bottle to keep it out of his children's hands. He kept this medicine bottle on the top shelf of a cabinet inside his garage. He used to own a .45-caliber handgun, but he sold it prior to the shooting. Although the duffle bag was his, he did not keep his tax returns in it. He denied the police had to make repeated telephone calls to his house on the day he was arrested; rather, he left the house as soon as he realized they were outside.

Preciado denied giving his brother access to the police reports in this case. He did not know if his brother had contacted Quiroz and called him an informant.

Preciado testified he had invoked his *Miranda* rights[4] when Girgle interviewed him, but he acknowledged no invocation appears in the transcript of his interview.

3. *Rebuttal evidence.*

Nothing had been omitted from the transcript of Girgle's interview with Preciado.

4. *Procedural background.*

A first trial ended in a hung jury, and then Preciado was convicted at the retrial.

**CONTENTION**

The trial court erred by admitting hearsay evidence.

**DISCUSSION**

Preciado contends his conviction must be reversed because the trial court improperly admitted hearsay evidence. This claim is meritless.

1. *Legal principles.*

"Relevant evidence is defined in Evidence Code section 210 to mean (in pertinent part) '. . . evidence . . . having any tendency in reason to prove or disprove any disputed fact . . . .' [¶] This definition of relevant evidence is manifestly broad. Evidence is relevant when no matter how weak it is it tends to prove a disputed

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

5

issue." (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843.) A trial court may exclude evidence if its probative value is substantially outweighed by the probability of wasted time or the danger of undue prejudice, confusing the issue, or misleading the jury. (Evid. Code, § 352.) A trial court's exercise of discretion under Evidence Code section 352 will not be overturned on appeal unless there has been an abuse of that discretion. (*People v. Raley* (1992) 2 Cal.4th 870, 895.)

"An out-of-court statement is properly admitted if a nonhearsay purpose for admitting the statement is identified, and the nonhearsay purpose is relevant to an issue in dispute. ([Citations]; see *People v. Scalzi* (1981) 126 Cal.App.3d 901, 907 . . . [' "*one important category of nonhearsay evidence [is] evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief. The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement.*" '].)" (*People v. Turner* (1994) 8 Cal.4th 137, 189, italics added, disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)

2. *Evidence linking Preciado to the Montclair residence.*

There was evidence that Quiroz and Andy's mother had been given cell phone numbers which they turned over to the El Monte police. When defense counsel objected to this evidence, the trial court ruled it was admissible to "explain the detective's activities, as well as how the information surfaced." Further evidence showed Detective Batres learned from Sprint Nextel that this cell phone number had been assigned to someone named Gerry Preciado. When defense counsel objected to this testimony on hearsay grounds, the prosecutor argued it was not being offered for the truth of the matter asserted, but rather to explain Batres's "subsequent actions." The trial court admitted the evidence on that ground.

We conclude this evidence about Preciado's cell phone was properly admitted for a non-hearsay purpose. "[I]t has consistently and properly been held that the

statements a police officer relies upon to make an arrest are admissible against hearsay objections, not to prove the truth of such statements, but to show the officer's state of mind (probable cause) in making the arrest. [Citations.]" (*People v. Marsh* (1962) 58 Cal.2d 732, 738.) It is true such state of mind evidence is admissible only if relevant to a disputed trial issue (see *People v. Lucero* (1998) 64 Cal.App.4th 1107, 1109-1110; *People v. Scalzi, supra,* 126 Cal.App.3d at pp. 906-907), and probable cause was not an issue in this case. However, an officer's state of mind may be relevant to disputed issues other than probable cause. (See, e.g., *People v. Ervine* (2009) 47 Cal.4th 745, 774 [to show officer/victim was lawfully performing official duty when he was killed, in order to prove defendant committed special circumstances murder]; *People v. Mayfield* (1997) 14 Cal.4th 668, 751 [to rebut allegation officer used excessive force].) As the Seventh Circuit has commented: "Tips that inform law enforcement of criminal activity may be offered into evidence for the purpose of explaining actions undertaken pursuant to a criminal investigation; their function, courts reason, is to give context, rather than to prove criminal activity." (*U.S. v. Lovelace* (7th Cir. 1997) 123 F.3d 650, 652.)

Preciado argues this case law is inapplicable to his case because he never asserted the police "behaved improperly or implied that their investigation lacked credibility," and he did not claim the "authorities had framed him. . . . [or] planted or manipulated evidence to falsely incriminate him as the shooter."

But this argument is contradicted by the record. At his first trial, Preciado testified he stored the plastic medicine bottle containing the bullets on a high shelf in his garage, not in his bedroom, and that it had been there ever since he moved into the Montclair house. Therefore, when Girgle told Preciado about finding ammunition in his bedroom, Preciado "figured [Girgle] was going to try to pin it on me . . . ." "[W]hen [Girgle] [told] me to tell him the truth, I told him I already told you the truth. And after he kind of pushed me to . . . make me . . . say that I did it when I did not do it, so that's when I said I'm going to hire a lawyer."

7

Preciado's accusations of police misconduct continued at the retrial, where he testified the police did not telephone him numerous times at the Montclair house before he surrendered, that Girgle lied about finding the ammunition-filled pill bottle in his bedroom, that he did not keep his tax forms inside the duffel bag, and that he had invoked his *Miranda* rights during the interrogation.

Hence, the disputed evidence was relevant to explain why the police focused their investigation on Preciado, and to rebut his claim they were framing him for the assault on Andy Macias. The disputed evidence was not substantively incriminating; it merely demonstrated why police put together the photo array from which Andy and Quiroz identified Preciado as the gunman. The disputed evidence was properly admitted as non-hearsay evidence explaining why and how the police investigation came to focus on Preciado.

3. *Evidence showing Quiroz had been intimidated.*

a. *Background.*

At trial, the prosecutor asked Quiroz what he had meant when he told a defense investigator he did not want to take the stand "for security purposes." Quiroz could not elaborate any further, saying: "Hmmm, just security purposes," and "I'm not sure. Just security purposes." The following colloquy then occurred:

"Q. All right. Did you also tell the private investigator that [the defendant's] brother . . . brought it to your attention that they have court papers . . . saying that [you are] an informant and –

"[Defense counsel]: Objection hearsay move to strike.

"The Court: Overruled. Effect on the hearer.

"Q. By [the prosecutor]: Sir, did you make that statement?

"Q. I think I did.

"Q. Okay. Why do you say that?

"A. Because it was brought to my attention."

The prosecutor went on to ask if Quiroz feared being labeled a snitch.

b. *Discussion*.

Evidence Code section 780 states: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (f) The existence of a bias, interest, or other motive. [¶] . . . [¶] (j) His attitude toward the action in which he testifies or toward the giving of testimony."

"[E]vidence that a witness is afraid to testify is relevant to the credibility of that witness and therefore admissible." (*People v. Warren* (1988) 45 Cal.3d 471, 481.) " 'It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible. [Citation.]' [Citation.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368.) Such evidence does not constitute hearsay because it is admitted only to show the witness's state of mind. (See, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1142, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151 ["evidence that [witness] feared retaliation for testifying against defendant was [properly] offered for the nonhearsay purpose of explaining inconsistencies in portions of her testimony"].)

Preciado argues that even if his brother's statement to Quiroz were admissible for the non-hearsay purpose of explaining Quiroz's state of mind, the evidence should have been excluded because there was a second level of hearsay: Quiroz's statement to the defense investigator. Preciado relies on the rule that "multiple hearsay is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception" (*People v. Arias* (1996) 13 Cal.4th 92, 149), and argues: "[T]he prosecutor did not ask Quiroz whether Mr. Preciado's brother had approached him and stated that he had court papers indicating he was a snitch. Rather, he asked Quiroz whether he had *told* a private investigator that the brother had made such a statement. Accordingly . . . the challenged evidence presented multiple levels of hearsay. . . ."

9

However, the very cases Preciado relies on demonstrate that, although Quiroz's statement to the defense investigator was extra-judicial, it did not constitute improper multiple hearsay. In *Arias*, the witness testified that some third person had reported that the defendant had admitted being the killer. (See *People v. Arias, supra,* 13 Cal.4th at pp. 148-149.) And in *People v. Smith* (2007) 40 Cal.4th 483, 518-519, the witness would have testified her boyfriend had told her that a third person had confessed to him. In each case, the testifying witness had no independent knowledge of the substantive extra-judicial assertion. Here, on the other hand, the testifying witness, Quiroz, did have that independent knowledge: Quiroz himself had heard Preciado's brother make the snitch remark, which was the substantive extra-judicial assertion at issue. This evidence was admitted to explain Quiroz's state of mind, and whether Quiroz told *both* the jury *and* the defense investigator about the threat was immaterial.

4. *Any possible error was harmless.*

In any event, even assuming arguendo that any of the disputed evidence did constitute inadmissible hearsay, there is no possible way it could have prejudiced Preciado. (See *People v. Homick* (2012) 55 Cal.4th 816, 872 [under *Watson* test[5], any error in admission of improper hearsay testimony was harmless in light of the strong evidence of defendant's guilt].) Preciado's conviction stemmed from the eyewitness identifications placing him at the shooting scene with a gun in his hand; the evidence about his cell phone number had little or nothing to do with the jury's determination he was guilty. Although the threat evidence was useful in explaining Quiroz's prior inconsistent statements about what he saw that night, at the retrial Quiroz testified he was certain Preciado was the person he saw with a gun.

---

[5]     *People v. Watson* (1956) 46 Cal.2d 818.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


CROSKEY, J.


ALDRICH, J.


11