Filed 12/2/21  P. v. Moten CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074152 |
| v. | (Super. Ct. No. FSB18000448) |
| JOSEPH MOTEN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Harold T. Wilson, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Allison V. Acosta and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.

# INTRODUCTION

Shortly after defendant Joseph Moten's brother, T.M., told defendant to move out, defendant fired a gun at T.M. but missed. T.M. passed out and when he regained consciousness, defendant pointed his gun at T.M. and threatened to kill him. When defendant's brother-in-law, F.G., who was also living with T.M., approached defendant to find out what was going on, defendant pointed his gun at him as well.

A jury convicted defendant of attempted murder (Pen. Code, §§ 664, 187, subd. (a)[1]; count 1), making criminal threats (§ 422, subd. (a); count 2), and assault with a firearm (§ 245, subd. (b); counts 3 & 4). The jury also found true allegations that, as to count 1, defendant personally used a firearm (§ 12022.53, subd. (b)) and intentionally discharged a firearm (§ 12022.53, subd. (c)). The jury found true as to counts 2 through 4 that defendant personally used a firearm (§ 12022.5, subd. (a)). In a bifurcated trial, the jury found defendant had four prior serious felony convictions (§ 667, subd. (a)(1)) and four strike priors (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), which the court dismissed for sentencing purposes.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

Defendant contends the prosecutor committed numerous instances of prejudicial prosecutorial miscondcut[2] when questioning defendant and during closing argument. Defendant also argues the trial court violated his constitutional rights by failing to conduct an ability to pay hearing before imposing a $3,000 restitution fine. In addition, defendant contends the trial court erred in not considering reducing his 20-year firearm enhancement on count 1 to a lesser enhancement under the same section. We reject defendant's contentions and affirm the judgment.

II.

FACTS

On January 31, 2018, defendant, his wife, and his teenage son, J.M., had been living with defendant's brother, T.M., for about 16 months. Defendant's brother-in-law, F.G., and his teenage daughter also lived with T.M.

A. *TM's Testimony*

T.M. testified that living with defendant was unpleasant. They frequently argued about house rules, including cleaning and paying bills. During the evening of January 31, 2018, at 7:00 p.m., T.M. told defendant that he and his family needed to move out because their living arrangement was not working out. Defendant calmly said "Okay." T.M. went to the living room and sat on the couch.

---

[2] "We observe that the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*).)

About five minutes later, defendant told his wife and son they were moving out. He told them to pack up and leave. Defendant's wife and son left while defendant was sitting on the living room couch and T.M. was sitting across from him on the love-seat. Seconds later defendant pulled out a gun and fired it at T.M. but missed him.

T.M. suffered from cancer, Alzheimer's, and a heart condition that caused him to have frequent fainting spells. As a result, when defendant fired the gun at him, T.M. fainted and fell on the floor. When he regained consciousness, T.M. could see F.G. and his daughter in their bedroom down the hall. Defendant was pointing a gun at them. T.M. heard defendant say to them, "you guys trying to plot against me, trying to get me out of here." Defendant also heard defendant say, "'You guys going to have to bury two of us.'"

While T.M. was still on the ground starting to get up, defendant kicked his head and said, "'I didn't shoot you.'" When T.M. stood up, defendant held the gun to T.M.'s head and under his neck, and said, "'We going to have two funerals, yours and mine. I'm going to kill you and I'm going to kill myself.'" While defendant continued to hold the gun to T.M.'s head, they argued about house rules and T.M. complained about defendant taking his food.

At gun-point and while threatening to kill T.M., defendant escorted T.M. outside the apartment. After about 15 seconds, defendant walked away and T.M. walked back into his apartment.

B. *F.G.'s Testimony*

Defendant's brother-in-law, F.G., testified that during the evening of the incident, he and his daughter were in their room watching television when he heard arguing in the living room. He heard defendant say, "[Y]ou think I'm playing," and then heard a gunshot. F.G. left his bedroom and went into the living room. F.G. saw defendant sitting on the love seat and T.M. lying on the floor. T.M. appeared to be unconscious.

Defendant pointed a gun at F.G. and said, "you want some too?" F.G. put his hands up, said he did not have anything to do with the argument, returned to his room and told his daughter they were leaving. Defendant entered F.G.'s bedroom holding a gun, and told F.G. he was going to have to bury two brothers. Defendant said they could leave because he did not want to scare F.G.'s daughter. As F.G. and his daughter were leaving, T.M. was still lying on the floor. When outside, F.G. noticed the police had arrived.

C. *JM's Testimony*

Defendant's son, J.M., testified that at 7:00 p.m., his father and T.M. began arguing about their living situation. T.M. went into J.M.'s bedroom, which J.M. shared with his mother and defendant. T.M. told defendant that he and his family had to move out because T.M. was tired of defendant disrespecting his home and failing to follow his rules. When J.M. went to his room with his mother to pack, they found defendant in the

5

room putting a silver gun in his pocket. J.M. told defendant that whatever he planned to do with the gun was not worth it. Defendant said, "'I love you,'" and left the room. By 7:45 p.m., J.M. had finished packing his belongings.

When J.M. and his mother left the apartment, T.M. was sitting on the couch and defendant was sitting on the love seat across from T.M. Before J.M. reached his car, he heard a gunshot and called 911. During the recorded 911 call played for the jury, J.M. reported that his father had a gun and he had heard a gunshot but did not see it happen. J.M. told the dispatcher he believed defendant had shot his uncle, T.M.

D. *Deputies' Testimony*

Deputy Hernandez testified that when he and his partner arrived at the crime scene, they saw defendant outside. After Hernandez twice ordered him to stop and show his hands, defendant tossed his gun and raised his hands. The deputies detained defendant and recovered the gun, which had a chambered round and was functioning properly.

Deputy Reyes testified he arrived at the scene at 7:51 p.m. He was the lead investigator on the case. He took T.M.'s recorded statement. T.M. told Deputy Reyes the bullet defendant fired at him traveled through the couch cushion where he was seated. Deputy Reyes inspected the cushion and found a hole in the sofa backrest. The bullet was recovered from inside the couch cushion.

6

E. *Defendant's Testimony*

Defendant testified he and T.M. had frequently argued about their living situation, such as chores and bills. They had argued earlier that day, around 3:00 p.m. Later, at 6:00 p.m., T.M. told defendant he wanted to talk. Defendant joined T.M. in the living room. T.M. said their living arrangement was not working out and he wanted defendant and his family to move out immediately. Defendant told T.M. he had just paid T.M. rent and extra money for the month. Defendant asked T.M. to return the money but T.M. refused. Five minutes later defendant told his son and wife they had to move out and to pack their belongings.

While defendant, his wife, and J.M. were packing in their bedroom, defendant pulled his gun out from under the bed mattress and set it on the bed. His wife asked what the gun was for and defendant said he could not leave it at the apartment. Defendant asked his wife and J.M. to leave and said he would join them shortly, after he took care of something. After they left, he placed the gun in a bundle of clothes because his gun did not fit in his pocket. Defendant walked out of his bedroom carrying the gun among the clothes.

When T.M. heard defendant come out of his bedroom, T.M. got up off the couch. As defendant was about to pass the coffee table in the living room, T.M. grabbed defendant by the arm and said he had to talk to him. The gun fell from the bundle of clothes defendant was carrying and hit the coffee table. The gun discharged when it hit

7

the table, bounced off the table, and fell on the floor in front of the coffee table. T.M. said, "'oof,'" passed out, and fell to the ground.

Defendant checked T.M. to see if he had been hit by a bullet and concluded he had not because there was no blood. Defendant picked up the gun and walked into F.G.'s room while holding the gun in his hand. Defendant denied pointing the gun at F.G. or threatening him. Defendant told F.G. that he and his daughter should leave.

After F.G. and his daughter left, defendant woke up T.M. by splashing water on his face and shaking him. Defendant helped T.M. to his feet. Defendant said to T.M., "look at what you did." "You caused this gun to go off." Defendant told T.M. he was leaving in a few minutes because living with T.M. was not working out. T.M. started arguing again with defendant. Defendant said he was leaving and would return the next day to get the rest of his family's belongings. Defendant walked out the door. The police apprehended defendant outside. Defendant denied trying to kill T.M. or scare him with a gun. He also denied pointing a gun at FG.

### III.

### PROSECUTOR MISCONDUCT

Defendant contends the prosecutor committed multiple instances of prejudicial misconduct which deprived defendant of a fair trial. Over defense counsel's objections, the prosecutor asked defendant to diagram the room where the shooting occurred and location of objects and people in the living room, including furniture, the gun, defendant, and T.M. The prosecutor also asked defendant to draw lines on the diagram showing the

8

trajectory of the bullet fired at T.M. and estimate the dimensions of the room and distances between objects in the room. When diagraming the crime scene and the location of items, defendant stated several times that he was not sure where things were located or distances. During closing argument, defense counsel argued defendant's testimony provided facts supporting his conviction.

The court sustained some of defense counsel's objections and admonished the prosecutor to refrain from asking questions requiring ballistic expertise, such as asking for specific technical information about the trajectory of the bullet. The court, however, permitted the prosecutor to ask defendant questions regarding the general direction the bullet travelled. The court stated that the prosecutor was permitted to ask defendant questions "as to basic issues such as direction without getting into specifics as to ballistics or specific trajectory."

A. *Challenged Questions and Closing Argument*

Defendant argues the prosecutor committed prejudicial error by asking defendant the following questions and requests to diagram the crime scene by drawing on photographic exhibits.

The prosecutor asked defendant to describe and diagram the position of the gun when it fell on the coffee table and then to the floor. Defense counsel objected to the prosecutor asking defendant to mark on a photographic exhibit where the gun was after falling on the floor. Counsel argued defendant was not certain of anything and therefore

9

could not mark anything on the exhibit with specificity. The court permitted defendant to mark the approximate area.

The prosecutor asked defendant to describe and diagram T.M.'s location on the floor after he fainted and where the gun was located in relation to his body on the floor. The prosecutor also asked defendant to mark photographic exhibits, showing the location of the bullet hole on the couch cushion. Defense counsel objected to the prosecutor asking defendant to draw the bullet hole in the cushion on the grounds the prosecutor was requesting hearsay, conjecture, and facts not within defendant's personal knowledge. The court sustained the objection. The court also sustained defense counsel's objection when the prosecutor asked defendant to draw on the crime scene photograph a line between where the gun first dropped to the bullet hole.

After defendant responded to questions demonstrating defendant's general knowledge of guns, the prosecutor asked defendant if, when a gun is fired, the bullet's trajectory is straight. The court sustained defense counsel's objection when the prosecutor asked defendant if, when the gun was dropped and the gun fired, the bullet trajectory was straight from the dropped gun to the bullet hole in the couch cushion.

The prosecutor asked defendant if he agreed that the bullet trajectory was straight from the dropped gun to the bullet hole in the couch cushion. Defense counsel objected on the grounds the question called for speculation, improper lay opinion, and improper expert testimony. The court sustained defendant's objection "as to trajectory." Therefore defendant did not respond to the question.

10

The prosecutor asked defendant to state the direction of the bullet's trajectory if the gun had been dropped and then fired with the barrel pointing at the couch. Without directly answering the question, defendant responded that the bullet could have hit something in or behind the couch that changed the trajectory of the bullet.

The prosecutor asked defendant to draw lines from the edges of the coffee table to the bullet hole in the couch and then to the wall behind the couch. Defense counsel objected on the ground the prosecutor was "testifying" when asking defendant to draw a diagram. The court sustained the objection.

The prosecutor asked defendant to measure with a ruler a CD shown in a crime scene photograph and then estimate the dimensions of the coffee able by estimating how many CDs would fit on the table in the photograph. The prosecutor also asked defendant to measure the distance between an ashtray on the table and the sofa, and estimate the distance between the edge of the coffee table and a couch seat cushion.

After defendant estimated the distance of the coffee table from the couch cushion was four feet, defense counsel objected that the prosecutor was requiring defendant to re-create the living room crime scene by using inaccurate measurements of the height of the coffee table in relation to the couch. Defense counsel asserted that the prosecutor should have provided appropriate measurements instead of relying on speculative measurements provided by defendant who does not have the expertise or ability to testify to such measurements. Defense counsel stated that the re-creation of the crime scene lacked foundation and was inaccurately represented. The court responded that the prosecutor

11

would be permitted to proceed with questioning defendant, but if he asked defendant for exact locations or an exact re-creation of the crime scene, the court would sustain objections to questions requesting any specifics. However, the court said it would allow questions as to "generalities."

After defendant's testimony, the defense rested and the court summarized for the record previous sidebar conferences, which included one concerning defense counsel's objection to the prosecutor's line of questioning, which included showing the jury one of the couch cushions and taking measurements. Defense counsel argued the prosecutor was improperly presenting a reenactment of the crime scene. The court stated it had overruled the objection with an admonishment that only general questions would be permitted when showing the jury the cushion. The court noted a little later there was another sidebar conference in which the court admonished the prosecutor to stop his line of questioning which bordered on improper reenactment of the crime scene.

In response to the court's summary of the sidebar conferences, defense counsel argued that the prosecutor had improperly required defendant to diagram the crime scene. Defense counsel acknowledged it was not improper for a witness to be asked to draw objects or mark exhibits but in the instant case, the prosecutor knowingly required defendant to draw an inaccurate diagram based on testimony that differed from testimony as to what actually existed at the time of the crime. Defense counsel requested the court to dismiss the case because the prosecutor knew the diagram he requested defendant to draw was false.

The court denied defense counsel's mistrial motion on the ground there was no prosecutorial misconduct. The court explained that the matter had been raised before and the court put a stop to the prosecution's questioning that came close to an improper scene reenactment. The court noted regarding the diagrams that defendant repeatedly stated that he was only giving his best estimate and was not sure of the measurements and diagram markings. The court added that, because there was no expert testimony provided regarding defendant's testimony, counsel could not include any "ballistic-type arguments unless it's general and it's Counsel's opinion. [¶] . . . [¶] . . . I want to make very clear there was no expert testimony today with respect to any ballistics or angles. Everything else is fair game. Again, everything is open to argument as long as it's based upon evidence that was presented."

Defendant also argues the prosecutor committed misconduct during closing argument when the prosecutor referred to the diagrams and measurements defendant provided during his testimony. In explaining the difference between direct and circumstantial evidence, the prosecutor argued that the couch cushion with the bullet hole was direct evidence showing the bullet entered from front to back of the cushion. The prosecutor added that the cushion evidence showed that defendant fired "in that general direction" toward the cushion. Defense counsel objected on the grounds the prosecutor misstated the law and facts, and it was improper argument.

13

Noting the objection, the court admonished the jury that the prosecutor's statements constituted argument in which counsel was interpreting the evidence as he viewed it. The court told the jury it would instruct the jury on the law, which the jury was required to follow. The court then permitted the prosecutor to continue arguing. Upon completion of closing argument, defense counsel again moved to dismiss the case based on his previously asserted prosecutorial misconduct objections, which counsel acknowledged the court had already ruled on. The court noted defense counsel's objection would be considered a running objection and found there was no prosecutorial misconduct. The court therefore denied the motion for mistrial.

B. *Forfeiture*

The People argue defendant forfeited his objection to prosecutorial misconduct because defense counsel objected to some but not all of the instances of misconduct raised on appeal, and because counsel only objected to questioning regarding crime scene measurements. The People also argue counsel did not request the trial court to admonish the jury regarding the prosecutor's improper questions or defendant's testimony.

"'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 858 (*Earp*); see *People v. Geier* (2007) 41 Cal.4th 555, 609; *People v. Partida* (2005) 37 Cal.4th 428, 431; Evid. Code, § 353, subd. (a).)

14

We conclude there was no forfeiture because defense counsel repeatedly objected to prosecutorial misconduct, including when the prosecutor asked defendant to diagram the crime scene and provide estimates, during closing argument, and by twice moving for mistrial based on prosecutorial misconduct. In addition, the trial court admonished the jury several times and noted that the trial court had considered defense counsel's prosecutorial misconduct objections as a running objection. We therefore will address defendant's prosecutorial misconduct objections on the merits.

C. *Prosecutorial Misconduct*

The applicable federal and state standards regarding prosecutorial misconduct are well established. A prosecutor's improper remarks can infect the trial with unfairness as to make the resulting conviction a denial of due process. (*People v. Earp*, *supra*, 20 Cal.4th at p. 858.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair under federal standards is prosecutorial misconduct under state law only if it involves "'''''''the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'''''''" [Citations.] (*Hill*, *supra*, 17 Cal.4th at p. 819.)

"We have held that a prosecutor commits misconduct by asking 'a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means.' [Citation.] For a prosecutor's question implying facts harmful to the defendant to come within this form of misconduct, however, the question must put before the jury information that falls outside the evidence and that, *but for the improper*

15

*question*, the jury would not have otherwise heard.  (See *People v. Warren* (1988) 45 Cal.3d 471, 481 [describing the gist of the misconduct as implying in the question 'facts [the prosecutor] could not prove'].)  Moreover, if 'the prosecutor is not asked to justify the question, a reviewing court is rarely able to determine whether this form of misconduct has occurred.'  [Citation.]" (*Earp*, *supra*, 20 Cal.4th at pp. 859-860.)  There need not be a showing of bad faith or malice to establish the existence of misconduct. (*People v. Bolton* (1979) 23 Cal.3d 208, 213-214.)

The scope of permissible prosecutorial argument is broad.  "'""[A] prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.]  It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.'  [Citation.]  'A prosecutor may "vigorously argue his case."'""" (*Hill*, *supra*, 17 Cal.4th at p. 819.)

1. *Misconduct During Interrogation of Defendant*

We discern no prejudicial misconduct by the prosecutor when interrogating defendant.  In every instance in which defendant argues there was prejudicial misconduct, the prosecutor's questions were supported by the evidence before the jury or inferences fairly drawn from that evidence.  While the prosecution could have provided evidence establishing precise measurements and testimony by a ballistic expert, there was no misconduct in eliciting testimony from defendant as to estimated measurements,

16

drawings, and descriptions of the crime scene. It was made clear that the information was imprecise. (*Earp*, *supra*, 20 Cal.4th at p. 860.)

Throughout defendant's testimony, he repeatedly stated that when providing estimates and marking exhibits, he was uncertain as to the information he was providing. He said he was unsure of the trajectory of the bullet, the distances between furniture and other objects in the living room, and the location of the gun when it discharged. Defendant frequently stated he disagreed with the prosecutor's statements and reluctantly complied with the prosecutor's requests to draw on the photographic crime scene exhibits the bullet trajectory and where various items and people were located at the crime scene. Defendant also repeatedly stated he was not certain of the room measurements, furniture dimensions, and locations of objects and people in the living room.

The general information and estimates the prosecutor requested defendant to provide did not require ballistic expertise or precise measurements. Counsel asked defendant questions demonstrating he had a basic understanding of guns. The prosecutor then asked defendant questions about his general understanding of the direction a bullet would travel when fired. Upon defendant acknowledging that a bullet would normally travel straight out of the gun barrel, the prosecutor requested defendant to draw straight lines from where the evidence indicated the gun may have discharged according to defendant's testimony, to the approximate location of the bullet hole in the couch cushion. The prosecutor's questions were within the parameters of the court's order not to ask any ballistic questions other than questions requiring generalized information. The

17

jury was not misled into concluding otherwise. We conclude the prosecutor's interrogation of defendant therefore did not constitute an unfair, egregious pattern of conduct.

### 2. *Misconduct During Closing Argument*

Defendant also has not demonstrated that during closing argument the prosecutor used deceptive or reprehensible methods to attempt to persuade the jury that defendant testified to precise facts regarding the living room and furniture dimensions, gun placement, and bullet trajectory.

Defendant specifically objects to the prosecutor's following argument made to the jury: "The People's case is not relying primarily on circumstantial evidence. The People's case is direct evidence. You have direct testimony of what . . . [F.G.] saw and what [J.M.] saw. That's all direct evidence. [¶] This seat cushion here . . . is direct evidence. The direction that this bullet entered from the front into the back is direct evidence . . . . There is no 'What's a reasonable interpretation of it?' That's what it is. That is direct evidence. Direct evidence can prove a fact by itself. This shows that the defendant fired from right where you were seated at in that general direction."

Over defense counsel's objection to this argument, the trial court admonished the jury: "[A]s I told you before, this is argument by counsel. They are interpreting the evidence as they see fit. I instructed you on the law. You're going to receive a copy of the jury instructions in the jury room. That is the laws that will apply to the case." The court then permitted the prosecutor to continue his argument. After the prosecutor

18

completed his argument, the court further instructed the jury that it must follow the law as instructed and, "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

The prosecutor's argument quoted above was well within the wide latitude given a prosecutor during closing argument. (*Hill*, *supra*, 17 Cal.4th at p. 819.) The prosecutor's argument was not deceptive, misleading, or reprehensible. Counsel referred to direct evidence, which included witness testimony and the bullet hole in the cushion. The prosecutor's argument that the direct evidence established the direction and path of the bullet trajectory was permissible argument amounting to "fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." (*Ibid.*)

In addition, the court admonished the jury that it was not bound by counsel's comments interpreting the law and facts. The court instructed that the jury alone was required to determine the facts and apply the law as instructed. Defendant argues the court's admonition was insufficient to overcome the prosecutor's improper questioning of defendant and closing argument. We disagree. As discussed above, the prosecutor's questioning defendant and closing argument did not constitute prosecutorial misconduct. Even if it did, the court's admonitions to the jury effectively reduced any possibility such interrogation and argument would result in the jury improperly deciding the facts and applying the law as instructed.

IV.

ABILITY TO PAY RESTITUTION FINE

At defendant's sentencing hearing, the court imposed a $3,000 restitution fine under section 1202.4. The court noted that it was "departing from the Probation request" of imposing the fine in the amount of $6,400. Defendant argues that the court violated his constitutional rights by assessing the fine without an ability to pay hearing. He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). Defendant acknowledges that defense counsel did not object to the restitution fine during sentencing and failed to request the court to determinate his ability to pay, even though *Dueñas* had been decided ten months before his sentencing. Defendant contends that defense counsel "was ineffective for failing to object to the restitution fine.

The People contend that defendant forfeited this issue, and even if he did not, there was no *Dueñas* error. We conclude that defendant forfeited the argument and defendant has not demonstrated ineffective assistance of counsel (IAC).

A. *The* Dueñas *Decision*

*Dueñas* held that the court violates due process under the federal and state Constitutions when it imposes court operations and facilities fees without first determining a convicted defendant's ability to pay them. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168-1169.) The court in *Dueñas* further held that, "to avoid serious constitutional questions" raised by the statutory restitution scheme, the court must stay execution of the mandatory restitution fine unless the court determines that the defendant has the ability to

20

pay it. (*Id*. at p. 1172.) At the ability-to-pay hearing, the defendant bears the burden of showing his or her inability to pay, and the court "must consider all relevant factors," including "potential prison pay during the period of incarceration to be served by the defendant." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490-491 [remanding for an ability to pay hearing]; accord *People v. Santos* (2019) 38 Cal.App.5th 923, 934 [on remand, the defendant must show his inability to pay, and the court may consider potential prison pay]; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96 (*Kopp*), review granted Nov. 13, 2019, S257844 [same].)

Since *Dueñas*, *supra*, 30 Cal.App.5th 1157, some courts have criticized *Dueñas's* due process analysis and have declined to follow it. (E.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, 322, 327-329, review granted Nov. 26, 2019, S258946 [holding that *Dueñas* was wrongly decided]; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928 [declining to apply *Dueñas's* "broad holding requiring trial courts in all cases to determine a defendant's ability to pay"].) Other courts have held that *Dueñas* was wrongly decided under due process principles, and that the Eighth Amendment's prohibition against excessive fines provides the proper framework for analyzing an ability to pay challenge. (E.g., *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069-1072; see also *Kopp*, *supra*, 38 Cal.App.5th at pp. 96-97 [applying *Dueñas's* due process analysis to the fees but holding that, on remand, an Eighth Amendment analysis should apply to the restitution fine, because it is punitive in nature].)

21

The California Supreme Court has granted review of the issues presented by *Dueñas* in *Kopp*, *supra*, 38 Cal.App.5th at page 47, including whether courts must "consider a defendant's ability to pay before imposing or executing fines, fees, and assessments," and if so, "which party bears the burden of proof regarding defendant's inability to pay." (*Kopp*, *supra*, 38 Cal.App.5th 47.)

B. *Forfeiture*

The failure to object in the trial court generally forfeits a claim on appeal and this principle is applicable to constitutional claims. (*People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.) "'[D]iscretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue.'" (*In re Sheena K.*, *supra*, at p. 887, fn. 7.)

In this case, defendant was sentenced on November 19, 2019, which was more than ten months after the court of appeal issued its decision in *Dueñas*, *supra*, 30 Cal.App.5th 1157. Although neither the parties nor the trial court specifically mentioned the decision, the court elected to reduce the amount of the restitution fine recommended in the probation report, thus indicating awareness of the need to consider under *Dueñas* defendant's ability to pay. Despite having the benefit of both *Dueñas* and a statutory right to object under section 1202.4, subdivisions (c) and (d), defendant did not object to the $3,000 restitution fine.

Even before *Dueñas*, *supra*, 30 Cal.App.5th 1157, section 1202.4 permitted the court to consider a defendant's inability to pay a restitution fine exceeding the statutory minimum fine. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1032.) The statute mandates that the court impose a restitution fine "unless it finds compelling and extraordinary reasons for not doing so," and "[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason." (§ 1202.4, subd. (c), italics added.) However, the court may consider the defendant's inability to pay "in increasing the amount of the restitution fine in excess of the minimum fine." (*Ibid*., italics omitted.)

At the time of defendant's charged crimes and sentencing, the law called for the court to consider a defendant's ability to pay in setting a restitution fine, and defendant could have objected at the time if he believed inadequate consideration was being given to this factor. (*People v. Nelson* (2011) 51 Cal.4th 198, 227; *People v. Gamache* (2010) 48 Cal.4th 347, 409.) Defendant did not object to the $3,000 fine amount, and did not request an ability to pay hearing. We therefore conclude defendant forfeited his objection to imposition of the $3,000 restitution fine by not objecting. (*People v. Nelson*, *supra*, at p. 227.)

C. *IAC*

Defendant alternatively argues, in the event we find defendant forfeited his objection to the restitution fine, that counsel rendered IAC by not requesting an ability to pay hearing and not objecting to the restitution fine based on inability to pay the fine. We conclude defendant has not met his burden of demonstrating IAC.

23

"'[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing:  that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736, quoting *People v. Alexander* (2010) 49 Cal.4th 846, 888; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mickel* (2016) 2 Cal.5th 181, 198.)  To establish deficient performance, defendant must show that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *Strickland v. Washington*, *supra*, at pp. 687-688; *People v. Mickel*, *supra*, at p. 198.)  "[W]e do not second-guess trial counsel's reasonable tactical decisions." (*People v. Lucas* (2014) 60 Cal.4th 153, 278.)  "[A] defendant's burden [is] 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""'no rational tactical purpose'"" for an action or omission." (*People v. Mickel*, *supra*, at p. 198.)

Here, defense counsel could have reasonably determined that it was more beneficial to defendant to accept the restitution fine amount rather than object and risk creating a record that might persuade the court that defendant was able to pay a higher restitution amount or impose additional assessments, fees, and fines.  According to the probation report, defendant had been employed with a construction company during the

two-year period preceding his crimes, earning $25 an hour. Although he was 62 years old at the time of sentencing, he was in good health.

Furthermore, it would have been reasonable for defense counsel to conclude that objecting to the restitution fine and requesting an ability-to-pay hearing would have been futile. The sentencing court's reduction of the restitution fine suggests the trial court had considered defendant's ability to pay. "[A]s the trial court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor." (*People v. Nelson*, *supra*, 51 Cal.4th at p. 227, quoting *People v. Gamache*, *supra*, 48 Cal.4th at p. 409.)

To establish IAC, defendant must demonstrate that "'(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958, quoting *People v. Mai*, *supra*, 57 Cal.4th at p. 1009.) Defendant has not met his burden of establishing any of these factors. He also has not demonstrated a reasonable probability of a more favorable result had counsel objected.

We cannot determine from the record why defense counsel did not object to the $3,000 restitution fine, but there were possible valid reasons for not doing so. The defendant's inability to pay is just one among many factors the court should consider in setting the restitution fine above the minimum. The court should also consider "the seriousness and gravity of the offense and the circumstances of its commission, any

economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime.  Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime." (§ 1202.4, subd. (d).)

Defense counsel may have decided not to object to the $3,000 restitution fine because he concluded that objecting to the fine or requesting an ability-to-pay hearing would have been futile, if not harmful to defendant, given the seriousness of defendant's offenses, the psychological harm to his two victims, and the court's apparent consideration of ability to pay by significantly reducing the recommended $6,400 restitution fine to $3,000.  We therefore conclude that defendant has not demonstrated IAC.

V.

IMPOSING A LESSER FIREARM ENHANCEMENT

Defendant contends the trial court erred in assuming it could only impose or strike the section 12022.53, subdivision (c)[3] enhancement on count 1 for discharging a firearm.  Defendant argues the court had the discretion to impose the lesser section 12022.53(b) enhancement in lieu of the greater section 12022.53(c) enhancement.  Defendant also argues his attorney was ineffective in not requesting the court do so.

---

[3] For ease of reference and brevity, we refer to section 12022.53, subdivision (b) as "section 12022.53(b)," section 12022.53, subdivision (c) as "section 12022.53(c)," and section 12022.53, subdivision (d) as "section 12022.53(d).

26

A. *Sentencing Background*

The jury found defendant guilty of attempted murder (count 1), among other offenses, and found true the count 1 enhancement allegations, that defendant personally used a firearm (§ 12022.53(b)) and discharged a firearm. (§ 12022.53 (c)). Defendant was sentenced on November 19, 2019, after enactment of Senate Bill No. 620 (2017-2018 Reg. Sess.; Stats. 2017, ch. 6, §§ 1,2) (Senate Bill No. 620), effective January 1, 2018. Senate Bill No. 620 amended the firearm enhancement statute, section 12022.53, to allow the court to strike certain qualifying enhancements. Subdivision (h) of section 12022.53 provides that "[t]he court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."

By written motion and during oral argument at sentencing, defense counsel urged the trial court to exercise its discretion under section 12022.53, subdivision (h), and strike the section 12022.53 firearm enhancements, but the court expressly declined to do so. The trial court sentenced defendant to the mid-term of seven years on count 1, plus a consecutive 20-year prison term for the section 12022.53(c) enhancement for discharging a firearm. The court also imposed but stayed a consecutive 10-year prison term for the section 12022.53(b) enhancement for using a firearm. Under section 12022.53, subdivision (f), the court could only impose one of the two firearm enhancements and was required to impose the longest enhancement.

When sentencing defendant on count 1, the court stated regarding the enhancements that, "[w]ith respect to the discharge of a firearm pursuant to 12022.53(c), the Court notes that the Court has discretion to strike that enhancement. The Court will not exercise discretion. Note that there was a lack of provocation in this case when [defendant] used the firearm, that the victim was 60 years and in ill health. The victim was, in fact, a family member. There is a prior disposition of violence. There is no remorse shown on your part. You failed to offer any type of aid and there were other victims closely associated to this case." The court imposed the 20-year enhancement consecutive to the count 1 term. The court further ordered that, "[w]ith respect to the Penal Code section 12022.53(b) allegation, use of a firearm, the Court will impose ten years, but the Court will stay that ten-year term, which would have been consecutive."

B. *Forfeiture*

By not raising his objection to the section 12022.53(c) enhancement in the trial court, defendant forfeited it. Claims involving a trial court's failure to properly make discretionary sentencing choices are forfeited if counsel fails to object below. (*People v. Scott* (1994) 9 Cal.4th 331, 353-354.) So long as the parties are clearly apprised of the sentence and the reasons supporting the choices, and were given a meaningful opportunity to object, the failure to lodge an objection to a trial court's sentencing choices at the hearing constitutes a forfeiture of the issue on appeal. (*Id.* at p. 356.)

Here, the trial court permitted defense counsel to argue regarding sentencing. After the court stated defendant's sentence and reasons for it, the court asked counsel if they wanted to add anything. Defendant had the opportunity at that time to object to the count 1 firearm enhancements but did not do so. Under these circumstances, we conclude defendant forfeited his objection to the court imposing the section 12022.53(c) enhancement.

C. *IAC in Not Requesting Lesser Firearm Enhancement*

Defendant argues that even if he forfeited his objection by not raising it in the trial court, his trial attorney's failure to request the court to impose the lesser section 12022.53(b) enhancement instead of the section 12022.53(c) enhancement constituted IAC. We disagree.

Effective January 1, 2018, the Legislature enacted Senate Bill No. 620, which amended section 12022.53, subdivision (h), to grant courts discretion to "'strike or dismiss'" a firearm enhancement imposed under section 12022.53 "'in the interest of justice pursuant to [s]ection 1385.'" (*People v. Tirado* (2019) 38 Cal.App.5th 637, 642, review granted Nov. 13, 2019, S257658.) Former section 12022.53, subdivision (h), prohibited courts from striking or dismissing firearm enhancements found true under section 12022.53, "'[n]otwithstanding [s]ection 1385 or any other provision of law.'" (Stats. 2010, ch. 711, § 5; see *People v. Tirado*, at p. 642, fn. 6.)

29

Defendant relies on *People v. Morrison* (2019) 34 Cal.App.5th 217, for the proposition that his case must be remanded for resentencing so the court may consider whether to strike his 20-year-to-life, section 12022.53(c) firearm enhancement, and impose the lesser 12022.53(b) enhancement. In *Morrison*, the court concluded that Senate Bill No. 620 gives courts discretion to strike a section 12022.53, subdivision (d) enhancement and impose a lesser enhancement under section 12022.53, subdivisions (b) or (c), even if the lesser enhancements were not pled or found true. (*People v. Morrison*, *supra*, at pp. 221-223.)

There is currently a split of authority on the question of whether Senate Bill No. 620 gives trial courts discretion to strike a greater firearm enhancement found true under section 12022.53, and impose a lesser included, *uncharged* firearm enhancement under the statute, when no such lesser firearm enhancement was pled or found true. (*People v. Valles* (2020) 49 Cal.App.5th 156, 166-167, review granted July 22, 2020, S262757; *People v. Yanez* (2020) 44 Cal.App.5th 452, 459-460, review granted April 22, 2020, S260819; *People v. Tirado*, *supra*, 38 Cal.App.5th at p. 644; *People v. Garcia* (2020) 46 Cal.App.5th 786, 788-789, review granted June 10, 2020, S261772; *People v. Delavega* (2021) 59 Cal.App.5th 1074, 1084, review granted April 14, 2021, S2672932; *People v. Morrison*, *supra*, 34 Cal.App.5th at pp. 221-223.) It is undisputed, however, that if two or more of the section 12022.53 firearm enhancements are charged and separately found true, a trial court can strike the greater enhancement, reducing the firearm related term to

30

the remaining lesser enhancement term.  (*People v. Delavega*, *supra*, at p. 1084,; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1090-1091.)

The current split of authority on whether Senate Bill No. 620 gives trial courts discretion to strike a greater firearm enhancement found true under section 12022.53, and impose a lesser included enhancement, is irrelevant here.  That line of cases concerns imposing lesser firearm enhancements that were *not pled or found true*, which is not the case here.  In the instant case, both the imposed section 12022.53(c) enhancement and lesser section 12022.53(b) enhancement were pled and found true.  In addition, the trial court considered and expressly rejected striking the section 12022.53(c) enhancement under section 12022.53(h).

Regardless of whether the sentencing court has discretion to substitute a lesser enhancement for a greater enhancement under *People v. Morrison*, *supra*, 34 Cal.App.5th 217, defendant has not met his burden of showing deficient representation or prejudice. The trial court stated specific reasons for not striking the section 12022.53(c) enhancement under section 12022.53, subdivision (h).  Defense counsel could have reasonably concluded, based on those stated reasons for not striking the section 12022.53(c) enhancement, that it was highly unlikely that the court would have imposed the lesser enhancement instead of the section 12022.53(c) enhancement, had counsel requested the court to do so.  Because it is not probable that the trial court would have imposed the section 12022.53(b) enhancement had defense counsel requested it, there is

31

no showing counsel's failure to object or request the lesser enhancement was prejudicial. Defendant therefore has not demonstrated IAC.

## VI.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

MILLER
Acting P. J.

RAPHAEL
J.